948 A.2d 762

Thomas A. McELWEE & Son, Inc.,
and John McElwee, Appellees

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION
AUTHORITY, a/k/a SEPTA, Appellant.

Supreme Court of Pennsylvania.

Argued April 16, 2007.

Decided June 2, 2008.

656

Michael Sklaroff, Esq. Burt M. Rublin, Esq., Elizabeth Watson Calhoun, Esq., Ballard, Spahr, Andrews & Ingersoll, L.L.P., Philadelphia, for SEPTA.

Elizabeth Utz Witmer, Esq., Joseph C. Monahan, Esq., Stephen S. Aichele, Esq., Saul, Ewing, Remick & Saul, L.L.P., A Delaware L.L.P., Philadelphia, for Pennsylvania Turnpike Commission.

William Jones Cressler, Esq., PA Department of Transportation, Harrisburg, for Pennsylvania Department of Transportation.

Marcel L. Groen, Esq., Kimberly A. Freimuth, Esq., Fox Rothschild, L.L.P., Warrington, for amicus curiae Delaware River Joint Toll Bridge Commission.

Francis J. Moran, Esq., Media, for Thomas A. McElwee & Son, Inc.

Peter A. Galante, Esq., Philadelphia, for John McElwee.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

### OPINION

Justice SAYLOR.

This matter involves the assertion of a *de facto* condemnation arising from a public transit authority's extensive construction work on one of its commuter rail lines.

## I. Background

Appellee, John McElwee ("McElwee"), owned and operated a printing business, Thomas A. McElwee & Son, Inc., on the 6200 block of Market Street in West Philadelphia. The business had existed in that location since the 1950s, and McElwee had taken over management of it from his father, Thomas McElwee, in 1998, although the latter stayed on as a part-time

employee. Also in 1998, Appellant, Southeastern Pennsylvania Transportation Authority ("SEPTA"), notified West Philadelphia landowners that extensive construction activity was required in the area as part of the ongoing reconstruction of the city's Market Street elevated commuter line. SEPTA scheduled outreach meetings and established a community information center to address the concerns of area landowners and to resolve complaints related to the project.

Construction activity at the 6200 block of Market Street was ongoing for approximately three years when, in May 2003, McElwee's business closed with over $20,000 in unpaid bills, allegedly having sustained business losses since construction began. In September 2003, Appellees petitioned the Philadelphia County Court of Common Pleas for the appointment of a board of viewers pursuant to Section 502(e) of the Eminent Domain Code,[1] 26 P.S. § 1–502(e)[2] (repealed and recodified as amended at 26 Pa.C.S. § 502(c)), claiming that SEPTA's actions had effected a *de facto* condemnation by causing the closure of the business. SEPTA filed preliminary objections, but the trial court ultimately granted Appellees' petition and entered an order appointing a board of viewers to determine condemnation damages. On SEPTA's motion for reconsideration, however, the trial court vacated its prior order and,

1. Act of June 27, 1964, Special Sess., P.L. 84 (as amended, 26 P.S. §§ 1–101–1–903) (the "Code").

2. That section provides that, "[i]f there has been a compensable injury suffered and no declaration of taking therefor has been filed, a condemnee may file a petition for the appointment of viewers ... setting forth such injury." 26 P.S. § 1–502(e). This Court has described Section 502(e) as reflecting the Legislature's recognition of the concept of a *de facto* taking, *see Conroy–Prugh Glass Co. v. PennDOT*, 456 Pa. 384, 388, 321 A.2d 598, 599 (1974), and stated that such a taking "occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property." *Id.* (quoting *Griggs v. Allegheny County*, 402 Pa. 411, 414, 168 A.2d 123, 124 (1961)); *accord Miller & Son Paving v. Plumstead Township*, 552 Pa. 652, 656, 717 A.2d 483, 485 (1998); *see also* Pa. Const. art. I, § 10 ("Nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."); U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation"); U.S. Const. amend. XIV ("nor shall any State deprive any person of ... property, without due process of law").

pursuant to an agreement by the parties, directed that further evidence be taken in the form of depositions.[3]

Counsel for Appellees deposed several individuals, including McElwee, Thomas McElwee, two former company employees, two former customers, and the company's accountant. Although SEPTA engaged in extensive cross-examination of Appellees' witnesses, it did not call any witnesses of its own to be deposed or offer any other contrary evidence. The following is a summary of the underlying events as alleged by Appellees and developed through their deposition testimony and exhibits.

A driveway on the subject property ran from the street to the back of the building, and the business relied on this driveway to receive raw materials and deliver finished products to customers because there was no other way to reach the rear of the property and such items could not be loaded or unloaded at the front of the building. SEPTA began work in January 2000 by closing off access to the 6200 block of Market Street from 63rd Street during most of the day and commencing excavations for the installation of utilities. Intermittently throughout the year, these excavations blocked the entrance to Appellees' driveway during construction hours—approximately 7:00 a.m. to 4:00 p.m. SEPTA crews would install metal plates over the excavations at the end of the workday to allow vehicular access to the driveway, but the excavations often interfered with daytime deliveries to and from the shop. Although SEPTA workers would sometimes lay the plates down to allow for a particular delivery when asked to do so, it

---

3. Under the Eminent Domain Code, "preliminary objections are the vehicle by which all factual and legal issues relative to the propriety of the appointment of viewers are assessed, and the statute authorizes the use of depositions to create a record where necessary." *Sienkiewicz v. PennDOT*, 584 Pa. 270, 275 n. 6, 883 A.2d 494, 497 n. 6 (2005) (citing 26 P.S. § 1–504 (prescribing that, upon the filing of preliminary objections, "[t]he court shall determine promptly all preliminary objections and make such orders and decrees as justice shall require. If an issue of fact is raised, evidence may be taken by deposition or otherwise as the court shall direct.")). Presently, the parties agreed that SEPTA's preliminary objections should be heard on written submissions to the court, and the petition requesting the appointment of a board of viewers would be deferred until resolution of the preliminary objections.

was frequently difficult to locate personnel who could perform the task. Delivery persons were therefore required to park on 62nd Street and manually wheel pallets of supplies to the shop. However, even in these instances, utility pipes sometimes blocked the driveway entrance, and, at such times, McElwee and his employees had to suspend their printing work for as much as an hour to assist with a delivery. Similar problems were encountered with respect to the delivery of the shop's finished products to customers, and McElwee therefore frequently took it upon himself to make deliveries and to pick up supplies before and after work.

In 2001 and early 2002, SEPTA's construction work near the printing shop decreased, although SEPTA workers nevertheless would frequently block the driveway entrance with personal and construction vehicles. In doing so, the workers ignored pavement markings indicating that vehicles should not be parked so as to block the entrance to the driveway. Locating the owner of a vehicle so that it could be moved and access to the driveway restored, moreover, proved time consuming and, in some instances, impossible. Additionally, William Noris, one of the company's employees, regularly attempted to complain about the situation to SEPTA by calling the phone number SEPTA had provided for this purpose. He was generally unable to reach SEPTA's contact person, however, and usually did not receive a return call.

The situation then worsened again in the summer of 2002, when SEPTA closed the entire 6200 block of Market Street to regular traffic in order to create a construction staging area and parking place for its personnel. Appellees were permitted to utilize the street for vehicular access to the driveway, but construction and other vehicles routinely blocked the driveway for several hours at a time throughout the day (although full access was restored each evening once construction was completed). Although Appellees' main supplier continued to make deliveries to the shop throughout the period of SEPTA's work, the needed materials had to be brought to the shop manually from the delivery truck's location on an adjacent block.

These conditions, which continued until the business closed in May 2003, dramatically curtailed printing work at the shop. Additionally, there were numerous occasions when a printing job could not be completed on time because a particular item specific to the job had to be purchased; under ordinary circumstances, McElwee would drive to a supply store to purchase it and return immediately, but without ready egress and ingress to his property, he had to await the end of the day when construction vehicles would be moved so he could exit the property. In these instances (which numbered over one hundred, according to McElwee), the print job would be delayed, causing customer dissatisfaction and/or cancellation of the work order. This, in turn, ultimately led to a substantial loss of revenue. In this regard, McElwee and his father testified that SEPTA's activity caused the business to lose at least three large printing jobs due to the unpredictability of driveway access after the 6200 block of Market Street was closed to traffic in 2002, and a former customer verified that the business declined his purchase orders due to SEPTA's activities.[1]

In their testimony, McElwee and his father asserted that the above-described interference with ingress and egress, together with the construction materials, equipment, and trash that littered the area throughout the period of SEPTA's work, led directly to the closure of the print shop because the business lost customers and was unable to obtain necessary supplies or to ensure the timely delivery of products. In support of their testimony, Appellees introduced an exhibit setting forth the company's profits and losses from 1999 to 2003. *See* Exhibit No. 9, RR. at 250a. Based on tax documents, the exhibit reflected that, although the business generated a profit in 1999, it sustained increasing losses once SEPTA's work began in 2000. In terms of specific revenue

**4.** Appellees additionally introduced numerous photographs taken by Thomas McElwee in June 2003. Although dating from the month after the business closed, the photographs allegedly depicted conditions similar to those that existed during the final year of the company's operation and revealed an extensive amount of interference with driveway access. *See* Plaintiffs' Exh. 27.

sources, Thomas McElwee testified that twenty percent of the company's revenue derived from walk-in trade prior to 2000, but that this percentage dropped off almost completely after SEPTA's activities commenced. John McElwee indicated that the decline in walk-in trade resulted in a decrease of approximately $60,000 in gross receipts in 2000 alone. Finally, after the business closed, McElwee testified that, as a result of his remaining debt, he lacked the funds to have the heavy printing equipment removed from the premises, which in turn interfered with his ability to generate income by leasing the building out. *See* Deposition of John McElwee, March 31, 2004, at 41–44, 94.

The trial court sustained SEPTA's preliminary objections, dismissed Appellees' petition with prejudice, and entered judgment in favor of SEPTA. Appellees lodged their appeal and filed a concise statement of matters complained of on appeal. In their statement, Appellees repeatedly asserted that the trial court had erred in view of their "overwhelming and uncontradicted testimony and exhibits" tending to show that SEPTA substantially interfered with access to their property and that this caused their business to fail. Thereafter, the trial court explained its ruling in a published opinion filed pursuant to Rule of Appellate Procedure 1925(a). *See McElwee v. SEPTA,* 75 Pa. D. & C.4th 411 (2005). The court set forth its factual understanding of the case as follows:

> Thomas and John [McElwee] testified that 20% of their business was walk-in customers from the neighborhood ... [Appellees] did not present any documentary evidence to support this estimate of walk-in business.

> \* \* \*

> Although [Appellees] claim "no supplier could deliver goods to the [their] business," the record belies this assertion. [Appellee] John McElwee testified that, at most, there was one example of a supplier who may have come out to the business but could not make the delivery; the supplier returned the next day.

\* \* \*

[Appellees] claim they lost customers because they could not meet deadlines due to the difficulty in getting supplies, however there was never a time when a delivery could not be made.

\* \* \*

[Appellees] allege their right to reasonable ingress and egress was denied. However, [they] were always able to access their property.

\* \* \*

[Appellees] presented evidence that their business slowed down during the time of the construction; however, they failed to demonstrate that the closing of the business was a direct and necessary consequence of the construction.

*Id.* at at 412–16.[5]

In its legal discussion, the trial court indicated that "a party alleging a *de facto* taking bears a heavy burden to prove that 'exceptional circumstances exist which substantially deprive [it] of the use of [its] property, and that the deprivation is the direct and necessary consequence of the actions of the entity having the power of eminent domain.'" *Id.* at 414–15 (quoting *Waldron Street Book Co. v. City of Pittsburgh,* 771 A.2d 111, 112 (Pa.Cmwlth.2001)). The court further highlighted that the Eminent Domain Code "does not permit any award of damages for the temporary loss of access during construction." *Id.* at 415 (quoting *Berk v. PennDOT,* 168 Pa.Cmwlth. 560, 566, 651 A.2d 195, 198 (1994)). Applying these principles, the court reasoned that Appellees had not demonstrated that the closure of the business was the necessary consequence of SEPTA's activity, and that they had therefore failed to carry

**5.** The trial court also pointed out that, although Appellees complained about the situation directly to SEPTA on a number of occasions, and that their complaints were ignored, Appellees never contacted the police or the Philadelphia Parking Authority in an attempt to have the workers' vehicles or construction equipment that were parked across their driveway towed away. *See McElwee,* 75 Pa. D. & C.4th at 414.

their burden. Furthermore, the court stated that, although access may have been temporarily limited during construction, "the circumstances were not exceptional, and SEPTA did not unreasonably interfere with [Appellees'] access to their property." *Id.* at 416.

In a published opinion a divided Commonwealth Court panel reversed the trial court's order and determined that there had been a *de facto* taking by SEPTA. *See Thomas A. McElwee & Son, Inc. v. SEPTA,* 896 A.2d 13 (Pa.Cmwlth.2006) (*en banc*). In describing the record's contents, the majority observed that there was substantial undisputed evidence in support of Appellees' claims concerning many of the essential underlying facts, including the company's proportion of walk-in business, photos depicting the condition of the sidewalks, and tax records. The majority also noted that

> there was extremely limited access to the Printing Company's driveway throughout the three-year construction period, and virtually no access during business hours when supplies were delivered or shipments were picked up. . . . SEPTA is correct that non-vehicular access to the Printing Company remained and that Appellants still were able to get deliveries and conduct business by arranging alternate methods of bringing in supplies. Nevertheless, because of the nature of the business, Appellants' need to make alternate arrangements to accommodate the lack of direct access severely curtailed productivity, which, eventually, led to the loss of clients and income and, ultimately, caused the business to fail. We conclude that this level of deprivation of use, where the ability to get raw goods to run a business is compromised for such a lengthy period, constitutes more than a "temporary inconvenience"; rather, these facts constitute exceptional circumstances that deprive the property owner of the beneficial use and enjoyment of his property.

*McElwee,* 896 A.2d at 21.

As a separate matter, the majority was not persuaded by SEPTA's attempt to distinguish the court's prior decisions in *McCracken v. City of Philadelphia,* 69 Pa.Cmwlth. 492, 451

A.2d 1046 (1982), and *Newman v. PennDOT,* 791 A.2d 1287 (Pa.Cmwlth.2002), from the present matter, stating as follows:

SEPTA points out that the disruption of business in *McCracken* was far more severe than in this case because the restaurant depended completely on walk-in customers, whereas Appellants' walk-in trade comprised only twenty percent of its business. However, in a small, struggling business, twenty percent can be the difference between remaining open and having to close, and once a business is forced to close, the disruption is total. SEPTA also notes that *Newman* concerned permanent interference with access to the property because one could never enter the property without damaging his vehicle, whereas, here, impediment to entry was not permanent because ditches in the street were covered over at night. One must wonder how SEPTA believes this helps a business that operates only during regular business hours.

*McElwee,* 896 A.2d at 21.

In reaching its decision, the Commonwealth Court relied on a line of its own precedent, including *Newman* and *Elser v. PennDOT,* 651 A.2d 567 (Pa.Cmwlth.1994), for the proposition that the right of access to one's property consists of the right to reasonable ingress and egress. In addition, the court determined that temporary construction activities may effect a *de facto* taking in situations where a business is forced to close due to those activities, since restoration of access is irrelevant to a landowner whose business no longer exists. *See id.* (citing *Friedman v. City of Philadelphia,* 94 Pa.Cmwlth. 572, 503 A.2d 1110 (1986)). Additionally, the majority distinguished *Truck Terminal Realty Co. v. PennDOT,* 486 Pa. 16, 403 A.2d 986 (1979), *Waldron,* and *Berk* from the present matter, stating that in those cases, some access, even if circuitous, had been maintained, and none of the landowners were forced out of business. *See McElwee,* 896 A.2d at 21. As to *Truck Terminal* in particular, the court summarized the relevant portion of the decision as holding that the Eminent Domain Code does not provide for damages for an impediment to access where patrons were inconvenienced by having to

travel an additional fourteen miles to reach the landowner's business. By contrast, the majority reasoned that because of the nature of Appellees' business, their productivity was severely curtailed by the lack of direct access, and this impediment was the cause of the business's failure. In this regard, the majority stated that whether a given activity of a governmental entity deprives a landowner of the beneficial use and enjoyment of his property depends on the owner's prior use of that property. *See id.* (citing *Genter v. Blair County Convention & Sports Facilities Authority*, 805 A.2d 51 (Pa.Cmwlth. 2002)). In support of its conclusion that the facts demonstrated the existence of exceptional circumstances that operated to deprive Appellees of the beneficial use and enjoyment of their property, the majority noted that even a revenue loss of twenty percent, such as that allegedly experienced by Appellees, might lead to the closure of a small business.

Judge Pellegrini filed a dissenting opinion, which Judge Cohn Jubelirer joined, stating that the majority had improperly made its own factual findings and had erred by failing to apply the principle expressed in *Truck Terminal* that the Eminent Domain Code does not generally provide damages for a temporary loss of access resulting from a construction project. The dissent additionally stated that the legal standard employed by the majority—which the dissent characterized as holding that a *de facto* taking occurs when reasonable ingress and egress to the subject property is denied even temporarily, so long as the effect is closure of the business— could not be harmonized with this Court's standard as enunciated in *Truck Terminal* and *Sienkiewicz v. PennDOT*, 584 Pa. 270, 883 A.2d 494 (2005) (*"Sienkiewicz I"*), *reargument denied*, 586 Pa. 80, 890 A.2d 1043 (2005) (*"Sienkiewicz II"*). Under the dissent's reading of those cases, "[t]he most favorable interpretation in favor of a *de facto* taking ... is that when access is denied but not required by construction necessities, such interference is arbitrary and unreasonable and a taking occurs." *McElwee*, 896 A.2d at 24 (Pellegrini, J., dissenting). The dissent portrayed this as a "very narrow standard," which it deemed to be justified, not only by this

Court's precedent, but by public policy considerations as well. In this latter regard, the dissent quoted from a treatise on eminent domain law, to the effect that "[c]onsequential damages to adjoining property owners in the way of diminution of business while construction is in progress does not constitute a taking of property for which compensation must be made under the Fifth Amendment of the Constitution. Such losses are *damnum absque injuria* [a loss or damage without injury] and, unfortunately, must be borne by the individual as part of the price that he or she pays for being a member of organized society and living in an urban community." *Id.* (quoting 2A JULIUS L. SACKMAN, NICHOLS' THE LAW OF EMINENT DOMAIN § 6.09[2] (rev.3d ed.1995) (brackets in original)).

We allowed further appeal in order to address the issues of whether the Commonwealth Court acted within the proper scope of review, and whether it applied the correct legal standard to the question of whether damages from a temporary interference with access are compensable pursuant to the Eminent Domain Code and this Court's decisions interpreting that statute. *See Thomas A. McElwee & Son, Inc. v. Southeastern Pa. Transp. Auth.*, 592 Pa. 776, 926 A.2d 444 (2006) (*per curiam* ).

## II. Standard of Review

Expanding on the points raised in Judge Pellegrini's dissent, SEPTA presently argues that the Commonwealth Court majority refused to defer to the trial court's findings of fact, and, instead, made its own credibility determinations, reweighed the evidence, and drew its own inferences from the record, thus violating this Court's holding in *Denes v. Pennsylvania Turnpike Commission*, 547 Pa. 152, 156, 689 A.2d 219, 222 (1997) (explaining that "appellate review in an eminent domain case is limited to a determination of . . . whether the findings of fact are supported by substantial evidence," and that "[q]uestions of credibility and conflicts in the evidence presented are for the trial court to resolve"). In advancing this argument, SEPTA emphasizes that the Commonwealth Court majority did not specifically state in its

opinion that any of the trial court's factual findings were unsupported by substantial evidence. Instead, SEPTA notes, the majority merely remarked that the case did "not turn on questions of credibility or evidentiary weight." *McElwee*, 896 A.2d at 22. SEPTA asserts, however, that the trial court clearly and repeatedly rejected Appellees' evidence. *See* Appellant's Brief at 19–20 (citing *McElwee*, 75 Pa. D. & C.4th at 412–416).

Appellees counter that uncontradicted record evidence demonstrates that they lost all access to the printing shop driveway due to SEPTA's activities for eight months in 2000, and from September 2002 until the printing business closed in May 2003. As such, they contend that a *de facto* condemnation occurred and that the trial court's contrary determination was not supported by substantial record evidence. Appellees also maintain that, although the Commonwealth Court majority did not specifically state that the trial court's conclusions were not borne out by sufficient record evidence, its opinion implied this conclusion by citing material from the undisputed record that served to demonstrate that the trial court's conclusions were unsupported. Furthermore, they aver that the Commonwealth Court majority was correct in stating that the trial court's resolution of this matter did not hinge on issues of credibility or evidentiary weight. *See* Brief for Appellees at 29 (citing *McElwee*, 896 A.2d at 21–22). Appellees contend that SEPTA did not present evidence disputing Appellees' claims, and that the trial court did not reject Appellees' evidence but concluded that it was insufficient to establish a *de facto* condemnation—a conclusion with which the Commonwealth Court disagreed, which it was permitted to do.

■■■ "A landowner alleging a de facto taking is under a heavy burden to establish that such a taking has occurred." *Miller & Son Paving v. Plumstead Township*, 552 Pa. 652, 656, 717 A.2d 483, 485 (1998). Appellate review in a case where the trial court has sustained preliminary objections to a petition for an appointment of viewers is directed to considering whether the common pleas court's findings are supported by substantial evidence of record, and whether the court

abused its discretion or committed an error of law. *See Sienkiewicz I*, 584 Pa. at 279, 883 A.2d at 500 (citing *Denes*, 547 Pa. at 156, 689 A.2d at 222 (1997)); *In re Condemnation by Municipality of Penn Hills*, 870 A.2d 400, 404 (Pa.Cmwlth. 2005).

■ As demonstrated above, the Commonwealth Court's recitation of this dispute's factual underpinnings contrasted sharply with that of the trial court. The appellate court, moreover, found that the trial court committed legal error in concluding that Appellees' evidence was insufficient to carry their "heavy burden" of proving SEPTA's actions constituted exceptional circumstances that substantially deprived them of the use and enjoyment of their property. *See McElwee*, 896 A.2d at 21–22 ("The trial court did not reject Appellants' evidence, but, instead, determined that it was legally insufficient to satisfy Appellants' burden of proof. We hold that the trial court erred in this regard."). A determination that the trial court committed legal error is within the proper scope of review in an inverse condemnation case brought by a property owner under the Eminent Domain Code. SEPTA argues, however, that the Commonwealth Court's conclusion in this respect was prohibited because it depended on that court's making of its own factual findings, rather than a simple evaluation of whether the trial court's findings were supported by substantial record evidence.[6] We disagree.

■ In the first place, we find it fairly evident, upon review of the entire record, that the trial court did not conduct as extensive a review of the testimony and other proofs as was necessary to fairly address Appellees' claims pertaining to SEPTA's interference with access to their property. In particular, the court suggested that Appellees failed to show that

6. We emphasize, again, that the trial court did not make formal findings, but rather, issued a Rule 1925 opinion in which it characterized the evidence as a backdrop to its legal analysis. Appellate review is aided where a common pleas court issues factual findings and legal conclusions as a basis for its order resolving the government's preliminary objections in the first instance; however, in this case, the trial court's opinion sufficiently sets forth its conception of the underlying facts to permit review.

exceptional circumstances existed by which they were substantially deprived of the beneficial use and enjoyment of their property, or that such deprivation was the immediate, necessary, and unavoidable consequence SEPTA's actions. *See McElwee,* 75 Pa. D. & C.4th at 414–15. The court also indicated that Appellees were always able to obtain needed supplies, and concluded that they did not establish a causal link between the reconstruction project and closure of the business. *See id.* at 412–16. These findings, however, are difficult to harmonize with the record, since Appellees' witnesses provided substantial uncontradicted testimony that access to the shop was severely compromised for lengthy periods due to SEPTA's activities in numerous respects, including that the driveway entrance was obstructed by large-scale excavations, utility pipes, heavy construction equipment, and the personal vehicles of construction personnel. Indeed, there was unrebutted testimony from several witnesses indicating that use of the driveway was critical to the operation of the business, and that a large amount of trade was lost as a result of its blockage over a multi-year period. *See, e.g.,* Deposition of John McElwee, March 31, 2004, at 51–59.

Likewise, although the trial court stated that Appellees did not suffer any damage due to the inability of suppliers to make deliveries, and indicated that Appellees had therefore failed to carry their burden to prove that they suffered substantial harm from SEPTA's long-term activities, this assertion overlooks the other evidence offered by Appellees that they were delayed in completing time-sensitive contracts due to the inability to purchase necessary supplies on an as-needed basis, as discussed above. In a similar vein, contrary to the trial court's indication that the evidence showed that "at most, there was one example of a supplier who may have come out to the business but could not make the delivery," but "the supplier returned the next day," John McElwee testified that in some instances needed supplies simply could not be delivered at all, and that profitable jobs were lost as a result. *See id.* at 57–59.[7]

7. The trial court's indication in this respect was based on a statement made by John McElwee during cross-examination to the effect that, on

Further, the proofs offered by Appellees tended to show a sharp decrease in the business's revenue throughout the period of construction, and that, because of this financial strain, the company became unable to pay its bills. *See id.* at 53–54. Given the testimony concerning the nature of Appellees' commercial activity and the timing of the company's insolvency, together with the financial proofs offered—all of which remained uncontradicted in terms of evidentiary development— we find that the trial court failed to adequately support its conclusion that Appellees did not establish any causal link between SEPTA's actions and the closure of their business.[8] Finally, notwithstanding the trial court's recitation that Appellees did not call the police to have SEPTA's vehicles and construction equipment towed away, *see supra* note 5, it did

one occasion in which he could not get raw materials on the day they were needed, the supplier returned the next day and delivered them. *See McElwee*, 75 Pa. D. & C.4th at 413 (citing Deposition of John McElwee, March 31, 2004, at 79). Thomas McElwee and Thomas DeFlavia also confirmed that when a supplier actually attempted to make a delivery and failed, it would return on a subsequent day. *See* Deposition of Thomas McElwee, March 31, 2004, at 92; Deposition of Thomas DeFlavia, May 6, 2004, at 22. To conclude from this that essential deliveries of supplies were never foreclosed by SEPTA's construction activities, however, would require ignoring other portions of the record. *See, e.g.,* Deposition of John McElwee, March 31, 2004, at 58 (reflecting that large "skids" of paper could never be delivered during the relevant timeframe, causing the business to lose lucrative contracts); Deposition of Thomas DeFlavia, May 6, 2004, at 15–16 (indicating that the delays in obtaining supplies and delivering products to clients led to a steady loss of business); *cf.* Deposition of William Noris, May 6, 2004, at 19 (recounting the continual loss of business due to walk-in or drive-in customers' inability to access to the property); *id.* at 25 (stating that UPS was often unable to access the property to make deliveries to customers). Thus, the record does not support the trial court's determination that raw materials could always be delivered as needed, or that, even when such deliveries were delayed due to the construction, Appellees' business did not suffer. *See McElwee*, 75 Pa. D. & C.4th at 413.

8. Indeed, the court acknowledged that the business began to "slow down" at about the time SEPTA impeded access to the property, but concluded in a summary fashion that the circumstances were "not exceptional" and that Appellees therefore did "not me[e]t their heavy burden of showing that the decline and closing of their business was caused by SEPTA's actions." *McElwee*, 75 Pa. D. & C.4th at 416. This conclusion appears to have been premised on the court's unsupported findings addressed above.

not reference any authority suggesting that a property owner's efforts to interfere with governmental operations is relevant to determining whether a *de facto* taking has occurred. Therefore, there is little doubt that the trial court's findings were not supported by substantial evidence; to the extent the Commonwealth Court's disposition entails a determination to this effect, we agree with it.

We also find that the appellate court's conclusion that the common pleas court committed legal error in holding that Appellees failed to carry their evidentiary burden is sustainable. For one thing, the trial court did not hold hearings at which it could observe witness demeanor and make credibility determinations accordingly, but was limited to a review of the same deposition transcripts and associated exhibits that were scrutinized by the appellate court. *See generally Thompson v. City of Philadelphia*, 507 Pa. 592, 599, 493 A.2d 669, 672–73 (1985) (noting that limitations on appellate review ordinarily derive from the fact that the trial court is "aided by an on-the-scene evaluation of the evidence," whereas an "appellate court's review rests solely upon a cold record"). Further, SEPTA did not offer any evidence of its own and, thus, did not add any material to the record tending to contradict Appellees' evidence, choosing instead to confine the scope of its evidentiary challenge to its cross-examination of Appellees' witnesses, which, on the record before us, did little to undermine·the allegations contained in their direct testimony.[9] In the absence of any such evidence from SEPTA, the trial court

9. Although SEPTA cross-examined the witnesses at some length, the latter did not waver in any substantive respect from their direct testimony. Indeed, much of the cross-examination primarily served to reveal further troubles that Appellees suffered as a result of SEPTA's activities. *See, e.g.,* Deposition of Thomas McElwee, March 31, 2004, at 84–86 (recounting that a SEPTA truck had accidentally broken through the shop's lower-level doors, and that SEPTA's initial efforts to repair the damage were insufficient, allowing rodents to enter the premises and raising the company's heating bills); *id.* at 87–88 (explaining that a "more than days"-long pipe welding operation by SEPTA, which was undertaken across the driveway entrance, caused the company to lose a number of purchase orders); *see also id.* at 99–100 (indicating that the advent of "quick copy" shops had had little effect Appellees' business, largely due to the latter's affiliation with various unions).

was, in essence, faced with determining whether the record built by Appellees established a *prima facie* case that a taking had occurred. *See Riedel v. County of Allegheny*, 159 Pa. Cmwlth. 583, 590, 633 A.2d 1325, 1329 (1993) (indicating that the property owner bears the initial burden to come forward with evidence that *prima facie* constitutes a *de facto* taking, which then shifts the burden to the government to rebut such evidence); *accord de de St. Aubin v. Flacke*, 68 N.Y.2d 66, 505 N.Y.S.2d 859, 496 N.E.2d 879, 885 (1986) ("Only when the landowner establishes a prima facie case by presenting evidence of sufficient quality and weight to permit the trier of fact to decide in his favor does the State have any burden at all . . . ." (internal quotation marks omitted)); *Bowles v. United States*, 31 Fed.Cl. 37, 47–48 (1994). The appellate role in reviewing trial court determinations concerning the sufficiency of the evidence to make out a *prima facie* case necessarily entails evaluating whether pertinent facts are, or are not, clearly established as of record; it follows that this evaluation is subsumed within the Commonwealth Court's assessment of whether the trial court committed legal error.

■■ Finally, the Commonwealth Court's disposition also includes a determination that Appellees were correct in arguing that the trial court abused its discretion by providing an unreasonable characterization of the record evidence. *See McElwee*, 896 A.2d at 18 & nn. 7–8.[10] While SEPTA claims that this, too, necessarily entailed unwarranted fact-finding on the part of the Commonwealth Court, we believe that it aligns

10. Although the trial court, as fact finder, may reject the testimony of any witness on credibility grounds, even when it is uncontroverted, the court may not do so arbitrarily. *See generally Fraternal Order of Police v. PLRB*, 557 Pa. 586, 592–93, 735 A.2d 96, 99 (1999) (recognizing that arbitrary and capricious decision making by the fact-finder implicates an error of law). The need for an articulated, reasoned basis for rejecting such testimony seems especially pronounced where, as here, the trial court did not observe witness demeanor but, instead, merely reviewed the deposition transcripts and documentary exhibits. Additionally, as outlined above, the trial court's opinion in this case does not identify any supportable grounds on which to discount Appellees' testimony predicated on SEPTA's cross-examination and, as a more general matter, does not give us confidence that it undertook the kind of thorough review of the record that Appellees were due.

with the approach utilized in *Sienkiewicz I,* wherein this Court not only determined that no record evidence existed to support a particular factual finding central to the trial court's decision to grant relief (i.e., that PennDOT had installed curbing along the "Stafford Straightaway"), but proceeded to delineate the essential facts that were proved by the uncontradicted record evidence in ultimately agreeing with PennDOT's position that relief was unjustified. *See Sienkiewicz I,* 584 Pa. at 282, 883 A.2d at 502 (recognizing that the evidence "establishes that direct access to Landowner's property was always from the Stafford Straightaway; factually, there was never any direct access from the Stafford Curve. Rather, this portion of the roadway, like Davis Street and the Route 81 ramps, was merely part of an adjacent road system providing a convenient flow of traffic in the direction of Landowner's property."). Under the circumstances of this case, then, we conclude that the Commonwealth Court's recitation and summary of the evidentiary record fell within its proper scope of review and was reasonable.

### III. Legal Standard

The other issue involved in this appeal is whether compensation is due on the facts established by Appellees—that is, whether the Commonwealth Court applied the correct legal standard to the underlying events. As to this question, SEPTA highlights the points raised in Judge Pellegrini's dissent and argues that the Commonwealth Court majority ignored the controlling precedent set forth by this Court with respect to *de facto* condemnation cases in *Truck Terminal,* later restated in *Sienkiewicz I.* SEPTA avers that these cases establish that, where there has been only a temporary interference with road access, no compensable claim exists under the Eminent Domain Code "absent extraordinary circumstances." *Sienkiewicz I,* 584 Pa. at 283 n. 11, 883 A.2d at 502 n. 11. In this regard, SEPTA asserts that the Commonwealth Court majority relied on its prior holdings in *Newman* and *Elser* to the effect that a taking occurs whenever a property owner has been denied reasonable ingress and egress, and

that in doing so, the majority failed to apply the principle, reflected in *Truck Terminal*, 486 Pa. at 23, 403 A.2d at 989, that compensation is only due when the interference was accomplished in an arbitrary or unreasonable manner. *See* Brief for Appellant at 13–17.

In response, Appellees argue that their claim is distinct from those advanced in *Truck Terminal*, *Sienkiewicz I*, and *Sienkiewicz II*, because the landowners in those cases always had access to their properties and did not assert claims for a loss of direct access. In advancing this position, Appellees note that the interference in *Truck Terminal* consisted of a detour. *See Truck Terminal*, 486 Pa. at 18, 403 A.2d at 987. In addition, they point out that this Court specifically determined that the construction project at issue in the *Sienkiewicz* matters had not resulted in a loss of direct access, but only in a diversion of traffic flow. *See* Appellees' Brief at 24 (citing *Sienkiewicz I*, 584 Pa. at 282, 883 A.2d at 502). By contrast, Appellees maintain that they have averred a loss of direct access that ultimately became a permanent loss of access by forcing them to close the printing business. On this point, Appellees argue that the Commonwealth Court majority's statement that an otherwise temporary interference with access to a business property can become permanent if it results in a closure of the business is supported by that court's earlier decision in *Newman*.[11]

In seeking further to distinguish their case from the *Truck Terminal* and *Sienkiewicz* matters, Appellees proffer that they have advanced their claim under Section 502 of the Eminent Domain Code. By contrast, Appellees highlight that *Truck Terminal* involved an assertion by an aggrieved landowner that the Legislature's enactment of Section 606 of the

11. Appellees also maintain that, in *Sienkiewicz II*, this Court recognized the validity of the Commonwealth Court's holding in *Newman*, that a temporary interference may become permanent if it causes a commercial landowner to close his business. In support of this contention, Appellees cite a portion of *Sienkiewicz II* in which the Court observes that the landowner in *Newman* established extraordinary circumstances by demonstrating, as a matter of record, that reasonable ingress and egress had been blocked by construction activity. *See* Appellees' Brief at 26 (citing *Sienkiewicz II*, 586 Pa. at 84, 890 A.2d at 1044).

Eminent Domain Code, 26 P.S. § 1–606 (repealed and recodified as amended at 26 Pa.C.S. § 706), operated to overturn the common law rule that damages resulting from a temporary interference with rights of access are noncompensable. Thus, Appellees claim that *Truck Terminal* is both factually and legally distinguishable from the present matter and that its holding should not control the present outcome. Appellees similarly attempt to distinguish the *Sienkiewicz* decisions by stating that, although the landowner in those matters initially instituted a suit pursuant to Section 502 of the Eminent Domain Code, he later amended his complaint to advance a claim for consequential damages under Section 612 of the Code, 26 P.S. § 1–612 (repealed and recodified as 26 Pa.C.S. § 714).

█ Initially, we recognize that, although the Commonwealth Court was correct in indicating that every property owner retains the right of access from a public roadway, *see Sienkiewicz I*, 584 Pa. at 276, 883 A.2d at 498, and that this right includes the right to reasonable ingress and egress, *see infra* note 13, it is undisputed that SEPTA's activities causing the complained-of interference with access lasted approximately three years, and were therefore temporary. This, facially at least, implicates the precept enunciated in *Truck Terminal* that "[t]emporary interference with road access falls under the noncompensable, exercise of the police power necessary to effectuate public improvement, unless the alleged interference was accomplished in an arbitrary or unreasonable manner." *Truck Terminal*, 486 Pa. at 23, 403 A.2d at 989; *cf. Sienkiewicz I*, 584 Pa. at 283 n. 11, 883 A.2d at 502 n. 11 (finding damages uncompensable to the extent they are predicated upon a temporary diversion of traffic flow during the period of construction, absent extraordinary circumstances). The Commonwealth Court discounted the present applicability of this restriction on the basis that *Truck Terminal* did not involve a failed business, and the construction at issue there caused mere inconvenience to the subject business's patrons by forcing them to travel along a circuitous route to reach the company; whereas here, there was virtually no access during

business hours on a substantial number of occasions over a three-year period, and the business failed as a result. *See McElwee*, 896 A.2d at 21. A close reading of *Truck Terminal*, however, reveals that the denial of compensation did not hinge so much on the fact that the business stayed open or that the detour constituted reasonable access, as it did upon the Court's evaluation of the language of the Eminent Domain Code as failing to change the long-standing common-law rule that, in general, no cause of action exists for a temporary loss of access to one's property. *See, e.g., Truck Terminal*, 486 Pa. at 22, 403 A.2d at 988–89 ("Since there was no cause of action at common law for the temporary deprivation of access caused by the work of making a public improvement, such temporary inconvenience not being deemed to constitute a 'taking' of a property right, appellant's contention boils down to the proposition that the legislature intended to create a compensable property right hitherto unknown to Pennsylvania...."). SEPTA is correct in urging that the primary exception to the rule enunciated in *Truck Terminal* occurs when the alleged interference is accomplished in an arbitrary or unreasonable manner. *Cf. Lawton v. Steele*, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894) (indicating that the government may constrain property rights in the interest of public health and safety, but that it may not do so using unnecessary or unduly oppressive means, or otherwise arbitrarily interfere with private business); *Commonwealth v. Barnes & Tucker Co.*, 472 Pa. 115, 123, 371 A.2d 461, 465 (1977) (same).

That said, we also are cognizant of a line of Commonwealth Court decisions that represent an effort to develop the contours of the *Truck Terminal* holding in situations where the governmental entity interferes with access temporarily, but the interference is direct and longstanding, and causes a business located on the property to fail.[12] These types of

12. By "direct," we mean to distinguish cases in which the government merely alters the traffic flow near the property, for which compensation generally has not been allowed. As this Court explained in *Wolf v. Department of Highways*, 422 Pa. 34, 220 A.2d 868 (1966),

what (the property owner) is losing, in fact, is the benefit—entirely unearned by him—to his land of the commercially exploitable prox-

decisions represent an appropriate means of fashioning judicial rules to guide courts in dealing with the myriad of situations in which the value of property interests can be eliminated or severely diminished by public works projects. *See generally Lehigh–Northampton Airport Auth. v. WBF Assocs.*, 728 A.2d 981, 985–86 (Pa.Cmwlth.1999) ("There is no bright line test to determine when government action is deemed to result in a de facto taking; instead, each case must be examined and decided. Thus, courts must provide, with case by case development, the needed doctrinal elaboration." (citing *In re Petition of 1301 Filbert Limited P'ship for the Appointment of Viewers*, 64 Pa.Cmwlth. 605, 441 A.2d 1345 (1982))).

■ Thus, in the Commonwealth Court's seminal case of *Friedman v. City of Philadelphia*, 94 Pa.Cmwlth. 572, 503 A.2d 1110 (1986), city construction activities obstructed access to the doors and windows of a clothing store, eventually causing the business to fail and rendering its leasehold interest in the premises valueless. The trial court sustained city's preliminary objections to the owner's petition for a board of viewers on the basis that the petitioner did not allege a permanent interference with access to the business. On appeal, the Commonwealth Court recognized the precept announced in *Truck Terminal* concerning temporary interference with property access, but ultimately reversed the trial court, reasoning that, although the obstacles to, and rerouting of, vehicular and pedestrian traffic may have been temporary from the city's point of view, once the business was destroyed those obstacles became permanent insofar as the business was concerned. Likewise, in *Newman v. PennDOT*, 791 A.2d 1287 (Pa.Cmwlth.2002), the court affirmed the trial court's dismissal of PennDOT's preliminary objections to a petition for the appointment of viewers, where PennDOT's two-year-long construction project had blocked access to the subject property,

imity of heavy traffic. Since he has no right to this benefit and has done nothing to create it, he should have little cause to complain at losing it.
*Id.* at 46, 220 A.2d at 874 (quoting Covey, *Frontage Roads: To Compensate or Not to Compensate*, 56 Nw. U.L.Rev. 587, 599 (1961)).

causing the petitioner's truck dealership to fail.[13] The *New-man* court contrasted the facts before it with situation in *Waldron Street Book Co. v. City of Pittsburgh*, 771 A.2d 111 (Pa.Cmwlth.2001), in which access to the affected business was available during business hours and there was only a five percent loss in sales during the period of construction. In that matter, the court affirmed the trial court's order sustaining the city's preliminary objections. The *Newman* panel also distinguished the case of *Berk v. PennDOT*, 168 Pa.Cmwlth. 560, 651 A.2d 195 (1994), on the grounds that, although the *Berk* occupants were deprived of access to the main entrance of their building, they never alleged a complete denial of reasonable ingress and egress. *See Newman*, 791 A.2d at 1290; *cf. Elser v. PennDOT*, 651 A.2d 567 (Pa.Cmwlth.1994) (determining that a *de facto* condemnation occurred where the government deposited a large pile of stones in the property's driveway and the homeowner had to travel over a dirt and grass yard to enter or exit the property); *PennDOT v. Richards*, 124 Pa.Cmwlth. 432, 556 A.2d 510 (1989) (finding compensation warranted where the landowner was unable to enter his property without scraping the bottom of his vehicle due to grading differences caused by the government's construction project).

The precept that a temporary obstruction becomes "permanent" relative to a claimant—thereby warranting compensation—whenever it causes the claimant's commercial enterprise to fail is not reflected in the language of *Truck Terminal*, and the parties have not referenced any other binding precedent that would imply it. If applied consistently, moreover, such a rule would mean that even a one-day interference with access would result in a *de facto* taking if it caused a company operating on the premises to close; this, in turn, would be in tension with the general rule that temporary inconveniences

13. The right of access to public roadways includes the right of reasonable ingress and egress to the property, *see Hession Condemnation Case*, 430 Pa. 273, 277, 242 A.2d 432, 434 (1968) (citing *Breinig v. Allegheny County*, 332 Pa. 474, 2 A.2d 842 (1938)), as well as the "further right to connect with or reach the system of public highways," *Wolf*, 422 Pa. at 46, 220 A.2d at 874 (quoting *State ex rel. State Highway Comm'n v. Meier*, 388 S.W.2d 855, 857 (Mo.1965)).

associated with the exercise of the government's police powers do not constitute the taking of property. *See Truck Terminal,* 486 Pa. at 22, 403 A.2d at 989; *accord City of Wichita v. McDonald's Corp.,* 266 Kan. 708, 971 P.2d 1189, 1197 (1999) ("The highway is continually being dug up for . . . sewers, gas mains, repairs and the like. The inconvenience and damage which a property owner suffers from these temporary obstructions are incident to city life and must be endured. The law gives [the adjoining landowner] no right to relief, recognizing that he recoups his damage in the benefit which he shares with the general public in the ultimate improvement which is being made." (alterations in original, internal quotation marks and citation omitted)).

On the other hand, the rule against compensation for temporary interference does not neatly lend itself to absolute application either because an obstruction that is nominally temporary may ultimately become, for all intents and purposes, the equivalent of a permanent denial of access if it is sufficiently protracted. *See generally In re McCrady,* 399 Pa. 586, 595, 160 A.2d 715, 719 (1960) ("When this seemingly absolute protection [of property] is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears." (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) (Holmes, J.))). Thus, for example, if the government were to undertake a public works project that substantially interfered with a property owner's access to public roads for many decades, it would be difficult to argue that no compensable injury occurred merely because access was restored at the end of this lengthy period. In this regard, the Court in *Truck Terminal* moderated its holding by suggesting that a *de facto* condemnation could arise if the public construction project was "unreasonably prolonged." *Truck Terminal,* 486 Pa. at 23 n. 8, 403 A.2d at 989 n. 8. In the temporary-obstruction scenario, therefore, the essential difficulty lies in ascertaining when the infringement upon reasonable access becomes unduly pro-

longed, or is otherwise accomplished in an arbitrary and unreasonable manner.

Clearly, if the governmental entity arbitrarily obstructs access to the subject property in the sense that the interference is unnecessary and the project could have been completed just as conveniently without substantial harm to any property owner, the situation would come within the exception to the *Truck Terminal* rule for arbitrary deprivations. *Cf. L–M–S Inc. v. Blackwell,* 149 Tex. 348, 233 S.W.2d 286, 289–90 (1950) (holding that a restaurant owner could only recover lost profits resulting from temporary street obstructions upon showing that placement of the obstructions was unreasonable or unnecessary). Presently, however, although Appellees adduced a significant amount of evidence concerning the inconvenience and disruption they suffered in their business pursuits, little in the record suggests that alternate means were available to SEPTA or that the driveway was blocked for vindictive or otherwise arbitrary reasons. Still, it is relevant that, under the disjunctive formulation utilized in *Truck Terminal,* the exception may also be triggered where the work is done in a way that is "unreasonable," or "unreasonably prolonged," even if it is not arbitrary. Thus, for present purposes the issue distills to whether the case adduced by Appellees demonstrates interference with access that was unreasonable under all of the circumstances.

Although the concept of an unreasonable interference with access cannot be delineated with precision, *see generally Riedel,* 159 Pa.Cmwlth. at 589, 633 A.2d at 1328 ("[E]ach [inverse condemnation] case turns on its unique factual matrix."); *Petition of 1301 Filbert Ltd. Partnership for Appointment of Viewers,* 64 Pa.Cmwlth. 605, 623, 441 A.2d 1345, 1353 (1982) ("[T]here is no litmus formula to determine when government action will be deemed to have the effect of such a taking."), it seems evident that the longer the interference lasts, the lighter the burden the *de facto* condemnee must carry to establish unreasonableness. *Accord ASAP Storage, Inc. v. City of Sparks,* 173 P.3d 734, 741 (Nev.2007) ("Although appellants correctly contend that the City's hindrance of a

landowner's right to access his or her land could rise to the level of a taking, the duration of any such impairment plays a significant role in determining whether the impairment substantially interferes with the owner's right to access his or her property."). *See generally id.* (finding that no substantial interference with access occurred for purposes of the state constitution's takings clause where the city prohibited the plaintiff from accessing its property during a 48–hour emergency period); *Rocky Mountain Thrift Stores v. Salt Lake City,* 784 P.2d 459, 465 (Utah 1989) (holding that no taking occurred where the government, in an effort to manage flood waters, precluded vehicular access to the city block on which the plaintiff business was located, but the inhibition lasted only 15 days and was a "one-time occurrence").

As applied to the present case (and as delineated above), Appellees presented uncontradicted evidence that: access to their driveway—which multiple witnesses described as the business's "lifeline"—was substantially obstructed over a three-year period; throughout this time, it was often difficult and time consuming, and sometimes impossible, to find a worker to move an automobile or a construction vehicle so as to restore access to the property during critical times of the work day; Appellees' employees, moreover, made numerous efforts to contact the designated SEPTA official in charge of handling complaints, but they were generally unable to reach this individual and often did not receive a return phone call; and the company lost so much revenue during this period that it ultimately became insolvent and was left with unpaid bills and heavy equipment that it could not afford to have moved from the premises. Considering these factors in their totality, we hold that, on the record before us, the Commonwealth Court did not err to the extent its opinion can be read to conclude that Appellees presented a *prima facie* case—that remained unrebutted—that SEPTA substantially deprived Appellees of the beneficial use and enjoyment of their property for purposes of Section 502(e) of the Eminent Domain Code, and that, consequently, SEPTA's preliminary objections should have been overruled.

## IV. Conclusion

Accordingly, we affirm the order of the Commonwealth Court. Jurisdiction is relinquished.

Former Chief Justice CAPPY and former Justices BALDWIN and FITZGERALD did not participate in the decision of this case.

Chief Justice CASTILLE, and Justice EAKIN and BAER join the opinion.