**[J-23-2020] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| PBS COALS, INC. AND PENN POCAHONTAS COAL, CO., | : | No. 41 WAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| Appellees | : | Commonwealth Court entered |
| | : | March 28, 2019 at No. 140 CD |
| | : | 2018, reversing the Order of the |
| v. | : | Court of Common Pleas of |
| | : | Somerset County entered January |
| | : | 23, 2018 at No. 98 Civil 2015 and |
| COMMONWEALTH OF PENNSYLVANIA, | : | remanding. |
| DEPARTMENT OF TRANSPORTATION, | : | |
| | : | SUBMITTED: April 16, 2020 |
| Appellant | : | |

**DISSENTING OPINION**

**JUSTICE MUNDY**                                    **DECIDED:  JANUARY 20, 2021**

"Substantial evidence of record" does not support the trial court's finding that PBS Coals, Inc. and Penn Pocahontas Coal, Co. (Coal Companies) were unlikely to obtain a mining permit from the Pennsylvania Department of Environmental Protection (DEP) for surface mining of the two coal reserves, the Brookville/A-Seam and the Clarion Rider Seam, on Parcel 55.[1]  Accordingly, I dissent.

The trial court concluded that the Coal Companies' ability to obtain a surface mine permit from DEP was "speculative and uncertain" based solely on "the factors . . . identified in the Tim Kania Note which failed to offer much encouragement based on

---

[1] "Appellate review in a case where the trial court has sustained preliminary objections to a petition for an appointment of viewers is directed to considering whether the common pleas court's findings are supported by substantial evidence of record, and whether the court abused its discretion or committed an error of law." *McElwee v. SEPTA*, 948 A.2d 762, 771 (Pa. 2008).

PaDEP's negative experience with acid mine drainage from mining the same seam as in nearby Job 21 which has a permanent treatment order in existence." Trial Ct. Mem., 1/23/18, at ¶ 96-97. The Kania[2] note was prepared for a March 29, 2005 meeting with PBS Coals to discuss its mining proposal for the Brookville/A-Seam. N.T., 2/15/17, at 2.120-22; PennDOT Ex. 14. The note states that based on the DEP's "current knowledge, the potential for successfully permitting the targeted reserves is low, because, given currently known facts, the potential for generating additional pollution is high." *Id.* The Majority concludes "the trial court was well within its province as the finder of fact to conclude that the issuance of a mining permit to the Coal Companies to commence a new mining operation was unlikely to occur." Majority Op. at 39.

The record does not support the dispositive weight the trial court gave to the Kania note. There are three issues with Kania's note that undercut the weight the trial court placed on it. First, the note does not indicate that Kania's comments were specific to surface mining the Brookville/A-Seam on Parcel 55; instead, his comments were directed at mining the seam generally. PennDOT Ex. 14. Second, Kania's comments were limited to the Brookville/A-Seam, and he did not offer any opinion regarding mining the Clarion Rider Seam either generally or mining that seam on Parcel 55. *Id.* Third, Kania wrote the note in 2005, five years before PennDOT acquired the portion of Parcel 54 that landlocked Parcel 55. As such, Kania's 2005 opinion did not reflect the "currently known facts" as of the date of the alleged de facto taking. For instance, the Coal Companies' expert, Louis Pierce, III, testified that he applied for a permit to mine the A-Seam on a parcel close to Parcel 55 in 2010, and the Commonwealth issued the permit in 2013.

---

[2] At the time of the hearing, Kania no longer worked for DEP's Cambria District Mining Office. His position at DEP is not clear from the record, other than Daniel Sammarco's testimony that Kania reported to the person who was Sammarco's predecessor. N.T., 2/15/17, at 2.120.

N.T., 2/14/17, at 1.63. Pierce was able to obtain a permit to mine the A-Seam eight years after Kania issued his note, despite Kania's reservations about further mining of the A-Seam.

Moreover, PennDOT introduced Kania's note through the testimony of its expert witness, Daniel Sammarco, the district mining manager for the DEP's Cambria District Mining Office. Sammarco's ultimate opinion was that "there would be areas of consideration of [P]arcel 55," but without seeing a completed permit application for surface mining Parcel 55, he was unable to state to a reasonable degree of certainty whether DEP would issue or deny a mining permit for Parcel 55. N.T., 2/15/17, at 2.103, 2.121-22. Sammarco's review of Kania's note did not change his opinion. *Id.* at 2.121-22. To Sammarco, Kania's note made it no more or no less likely that the Coal Companies would be able to obtain a permit for Parcel 55. *Id.* In its findings of fact, the trial court acknowledged Sammarco "testified that none of the information that had been presented to him by PennDOT, PBS or Penn Pocahontas in this case would prevent a permit for surface mining of the applicable seams underlying Parcel 55." Trial Ct. Mem., 1/23/18, at ¶ 69. However, despite Sammarco's testimony and the trial court's factual finding, the trial court concluded the opposite. Therefore, Kania's note does not constitute "substantial evidence of record" to support the trial court's conclusion.

Additionally, the Coal Companies presented two experts who opined to a reasonable degree of certainty that the companies could obtain surface mining permits for Parcel 55 by mitigating all of DEP's concerns. First, Pierce, an expert in geology, hydrology, and mine permitting, expressed "confidence that there isn't anything on [P]arcel 55 that would initiate a decline for a permit." N.T., 2/14/17, at 1.62, 1.106. Pierce conducted an overburden analysis based on five drill holes on Parcel 55 and determined 2,200 tons per acre of alkaline addition would neutralize the overburden. *Id.* at 1.77-78,

1.81. He noted that in a different A-Seam mine for which he had previously obtained a permit, DEP required a greater alkaline addition (7,000 tons per acre), so he included that figure in his overburden analysis even though his opinion was 2,200 tons per acre would have been sufficient. *Id.* at 1.82-83. Further, Pierce did not identify any streams on Parcel 55 on the USGS topographic quad, and he stated there was a possible wetland of less than two acres, which the Coal Companies could mitigate by rebuilding it post-mining. *Id.* at 1.83-84. Based on his analysis of Parcel 55 and his experience of 15 years of obtaining approximately 40 mining permits, he stated a surface mine on Parcel 55 is permittable. *Id.* at 1.84.

Likewise, the Coal Companies presented Robert Kudlawiec as an expert in mining engineering, mine permitting, mine planning, and mine operation. *Id.* at 1.116. Kudlawiec developed a surface mining plan for Parcel 55. *Id.* at 1.119. Specifically, he stated that the wetlands on Parcel 55 were not a barrier to a permit because they could be mitigated by replacing them post-mining. *Id.* at 1.137. Further, he stated he would use 7,000 tons of alkaline addition per acre. *Id.* at 1.153. He opined that Parcel 55 is permittable based on his work on Parcel 55 and his professional experience, including obtaining 24 surface mine permits without having any permit applications denied. *Id.* at 1.141, 1.150, 1.152.

The Coal Companies' experts' testimony aligned with Sammarco's description of the permit approval process as providing applicants the opportunity to remedy any deficiencies DEP identified. Sammarco detailed the pre-application process, which begins 45 days after his office receives a pre-application and includes a field view giving DEP the opportunity to provide comments to the applicant. N.T., 2/15/17, at 2.102. This is followed by a comment letter with citations, which gives an applicant notice of any deficiencies in the pre-application. *Id.* Sammarco testified that at the time his office sends the comment letter with deficiencies, he is unable to say with a reasonable degree of

certainty whether DEP would issue a permit. *Id.* at 2.103. While he testified that his knowledge of Parcel 55 was limited to the prior testimony at the hearing and viewing the map one or two times, he acknowledged several considerations for the potential permitting of Parcel 55, including wetlands, an intermittent stream, the wetlands on surrounding parcels, the presence of the Indiana bat habitat, and the ongoing Job 21 remediation. *Id.* at 2.108, 2.114-115. Despite these potential areas of concern, his ultimate opinion was that the DEP could not make a determination on a permit without a review of a formal application. *Id.* at 2.115. He did not testify that a permit would be denied or even that the considerations he identified meant a permit was unlikely to be issued. Thus, even PennDOT's expert acknowledged he could not make the conclusion that the trial court ultimately made.[3]

After hearing Sammarco's testimony, Kudlawiec testified in rebuttal that the Coal Companies could mitigate all of Sammarco's concerns. N.T., 2/16/17, at 2.36-38, 2.41-50. Kudlawiec maintained that he was reasonably certain DEP would issue a permit for surface mining on Parcel 55. *Id.* at 3.57; *see also id.* at 3.58 (stating "I cannot guarantee but I have a high degree of probability that it would be issued"). Significantly, the trial court found that "[a]t the time of the February 14-16, 2017 hearings, PennDOT did not offer any testimony or reports to the effect that the coal reserves underlying [P]arcel 55 could not be mined or permitted by PaDEP." Trial Ct. Mem., 1/23/18, at ¶ 82.

---

[3] The Majority cites several of the considerations that Sammarco raised—the wetlands on Parcel 55, the intermittent stream, the neutralization of the overburden—in support of its conclusion that the record supports the trial court's finding that DEP was unlikely to issue a permit to the Coal Companies. Majority Op. at 39. However, the Majority does not acknowledge that these areas of concern did not lead Sammarco to opine that DEP was unlikely to issue a permit. *Accord* Trial Ct. Mem., 1/23/18, at ¶ 69 (issuing a factual finding that Sammarco testified none of the information within his knowledge would prevent DEP from issuing a permit for the surface mining of Parcel 55).

In my view, the Coal Companies met their burden of establishing a prima facie case that PennDOT committed a de facto taking of Parcel 55's coal estate, for which the Coal Companies were likely to obtain a permit, and PennDOT did not rebut this evidence. *See McElwee*, 948 A.2d at 773. Further, the trial court's conclusion that the Coal Companies' ability to obtain a surface mining permit was speculative and uncertain is not supported by substantial evidence of record. Accordingly, I would affirm the Commonwealth Court on the basis that the record lacked substantial evidence to support the trial court's conclusion that Parcel 55 was not permittable, and I dissent to the Majority's holding to the contrary.