**[J-69A&B-2021]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| CARL F. HUGHES AND ELLEN B. HUGHES, H/W, AND BRUCE D. HUGHES AND MARGARET K. HUGHES, H/W, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : : : : : : : | No. 49 MAP 2021<br><br>Appeal from the Commonwealth Court dated 11/12/20 at No. 453 CD 2019 affirming the order of the Tioga County Court of Common Pleas, Civil Division, dated 3/25/19 at No. 714-CV-2014 |
| Appellants | : : | |
| v. | : : : : | |
| UGI STORAGE COMPANY, | : : | |
| Appellee | : | ARGUED: October 27, 2021 |

| | | |
|---|---|---|
| JOHN ALBRECHT, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : : : | No. 50 MAP 2021<br><br>Appeal from the Commonwealth Court dated 11/12/20 at No. 454 CD 2019 affirming the order of the Tioga County Court of Common Pleas, Civil Division, dated 3/25/19 at No. 854-CV-2015 |
| Appellants | : : | |
| v. | : : | |
| UGI STORAGE COMPANY, | : : | |
| Appellee | : | ARGUED: October 27, 2021 |

*OPINION*

**JUSTICE SAYLOR**                                    **DECIDED: November 29, 2021**

In these consolidated appeals, we consider the Commonwealth Court's holding that, to be held liable for damages under Pennsylvania's inverse condemnation statute, an entity must be clothed with the power of eminent domain – not only in a general sense, in that it must be a governmental or quasi-public entity to which condemnation powers may be delegated – but also, the entity must be invested with eminent domain authority specific to the property in issue.[1]

In 2009, Appellee, UGI Storage Company ("Appellee" or "UGI Storage"), filed an application with the Federal Energy Regulatory Commission (the "Commission" or "FERC"), in which it sought a certificate of public convenience and necessity to enable it to acquire and operate certain facilities in the interstate transportation and sale of natural gas.[2] The subject facilities were, at the time, owned and operated by UGI Central Penn

---

[1] In this opinion, the term "quasi-public entity" denotes an entity to which the government has delegated special powers, such as the power to condemn property, in furtherance of the public interest. *See Chicago B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 587, 26 S. Ct. 341, 348 (1906) (explaining that public utilities are "quasi-public" corporations that may invoke eminent domain for the greater public interest); *Dow v. Beidelman*, 125 U.S. 680, 687, 8 S. Ct. 1028, 1029 (1888) (relating that companies incorporated to serve the public and delegated extraordinary governmental powers in furtherance of this aim are "engaged in a public employment"). *See generally* 8 S.W. MOORE, NICHOLS ON EMINENT DOMAIN, § G14A.01 (2008) ("[T]the public utility's importance to society gives it a unique status in property law.").

[2] *See* 15 U.S.C. §717f(c)(1)(A) ("No natural-gas company . . . shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations.").

Gas, Inc. ("CPG"), a company which was regulated by the Pennsylvania Public Utility Commission (the "PUC"). *See In re UGI Storage Co.*, 133 FERC ¶61073, 61388, 2010 WL 4144237, at *1 (Oct. 21, 2010).

In relevant part, Appellee wished to acquire and operate underground natural gas storage facilities including a 1,216-acre facility in Tioga County, which the company referred to as the Meeker storage field.[3]  During the application proceedings, Appellee also sought to include within the certificated facilities a 2,980-acre protective zone around the storage field, *see id.* at 61397, 2010 WL 4144237, at *12, which we will refer to as the proposed buffer zone.[4]  Appellants' properties lie within this designated area.[5]

FERC ultimately granted the application to permit Appellee to acquire and assume the operation of the Meeker storage field.  The agency, however, denied Appellee's request to certificate a cohesive 2,980-acre buffer zone.

---

[3] According to FERC, the Meeker storage field originally had been a production reservoir, but it was converted to the storage use after its depletion in 1943.  *See id.* at 61388, 2010 WL 4144237, at *1.  The interstate dynamic of the proposed acquisition is made most apparent by the fact that Appellee concomitantly sought to acquire and operate a pipeline connecting the Meeker storage field with an interstate pipeline system.  *See id.* at 61390, 2010 WL 4144237, at *3.

[4] This proposed buffer zone apparently has a 3,000-foot diameter and is sometimes referred to by the litigants as such.

[5] In the present litigation, Appellee has not been forthcoming with much information about the character and significance of the proposed buffer zone.  Rather, the company has taken the position that the "need for and the creation of a buffer zone" are irrelevant, both on account of Appellee's threshold claim that its lack of property-specific condemnation power precludes an inverse condemnation action, and since the "need for and the creation of" issues "have been vetted and approved by [FERC]." Reply to Plaintiff's Opposition to UGI Storage Company's Motion for a Protective Order in *Albrecht v. UGI Storage Co.*, No. 854-CV-2015 (C.P. Tioga).  As developed below, factual disputes concerning the nature of buffer zones and the impact of the proposed buffer zone on Appellants' property rights pervade the underlying litigation.

According to the Commission, Appellee's application provided FERC with scant detail about the proposed buffer zone. *See In re UGI Storage*, 133 FERC at 61397, 2010 WL 4144237, at *12 ("Although the map of Meeker provided by UGI Storage identified a proposed buffer zone around the field, the application provided no other information on the buffer."). Furthermore, FERC explained, while CPG had long operated the storage facility, that company didn't own the "necessary property rights" to the entire proposed buffer zone. *Id.* The Commission also observed that Appellee had not provided any information regarding negotiations to acquire property rights in the remainder of the proposed buffer area. *See id.* Of greatest import, FERC related, Appellee "did not comply with the Commission's landowner notification requirements in section 157.6(d) of the Commission's regulations." *Id.* at 61397, 2010 WL 4144237, at *13. In this regard, the company provided the federal agency with no evidence that it had contacted the owners of the properties in the proposed buffer zone where CPG lacked the "necessary property rights." *Id.*

In view of the material violation of federal regulatory law on Appellee's part as discerned by the Commission, it certificated only those portions of the proposed buffer zone for which the company had acquired the "necessary property rights" or would be able to acquire such rights from CPG. *Id.* Additionally, the agency directed Appellee to provide detailed information delineating the property rights that CPG owned or Appellee may have acquired. *See id.*

At this juncture, we take the opportunity to observe that the partial certification of the gas-storage-field buffer zone does not appear to have been consonant with the Commission's ordinary protocols. As Appellee has otherwise related in this litigation:

> FERC has made clear that the appropriate size of a buffer
> zone will be determined "on a site specific, case-by-case basis
> taking into consideration the surrounding geology, structure,

operational history, presence of third party producers, and any other circumstances or technical information that may be specific to a particular storage field."

Response of UGI Storage to Plaintiff's Supplemental Memorandum of Law in *Albrecht*, 854-CV-2015, at 11 (quoting *Dominion Transmission, Inc.*, 141 FERC ¶61183, 61925, 2012 WL 5991314, at *7 (2012)).[6]  Here, however, the irregular configuration of the certificated buffer zone was based on the singular consideration that the company had violated federal regulatory law, with respect to large segments of the proposed buffer zone – albeit in a way that could be remedied – by failing to afford required notice to the landowners.

Appellee responded to FERC's directive to provide additional information in a letter of counsel and an accompanying "Report on Meeker Storage Rights."  In this submission, the company provided the Commission with maps reflecting the property rights that CPG had acquired and which would be assigned to Appellee as of the time interstate operations were commenced.  Appellee also related that it had not undertaken any independent acquisition of storage rights pertaining to Meeker "at this time."  *Letter of Post & Schell, P.C.*, dated Nov. 22, 2010, in *UGI Storage*, No. CP10-23-000, at Attachment A.

Additionally, Appellee explained that there were "large acreage positions on the southeast side of the proposed 3,000 foot protective perimeter of Meeker where UGI Storage and CPG have been unable to identify any contractual storage rights under a definitive property interest agreement."  *Id.*  According to the company, similar "potential

---

[6] Although Appellee has disputed that the following guidance applies beyond the four corners of the *Dominion Transmission* case, we note that the Commission also explained in general terms that, "absent evidence to the contrary, . . . it is important that storage fields have a buffer zone to protect the integrity of the storage field, especially in areas, as here, where intensive natural gas production activities are possible." *Id.* at 61183, 2012 WL 5991314, at *6.

deficiencies" existed in other areas of the proposed buffer zone (generally referred to in the letter as a "protective perimeter"). *Id.* Acknowledging that it was possible that CPG lacked contractual storage rights on these tracts, Appellee opined that that company's "right to conduct storage operations in these locations is protected under Pennsylvania's eminent domain statute . . . which contemplates that when an entity clothed with the power of eminent domain has appropriated land for its own uses, the result is a de facto taking recognized under state law." *Id.* (citing, *inter alia*, 26 Pa.C.S. §502(c)). [7]

Appellee continued:

> In light of the pending transfer of Meeker from CPG to UGI Storage and the shift to full FERC jurisdiction over the operation of the facility under the [federal Natural Gas Act], UGI Storage will not continue to rely on state law for the security of its storage land interests. Rather, UGI Storage and CPG have commenced and will continue to pursue a comprehensive evaluation of its property rights within the 3,000 foot protective perimeter, in order to clearly determine the storage rights that it holds and the rights that it needs. UGI Storage *will then pursue a land acquisition program, through which it will seek to acquire contractual storage rights from current landowners*, in full compliance with the Commission's land notification requirements. As UGI Storage acquires additional storage rights within the protective perimeter, it will

---

[7] The litigants dispute what was meant by this passage. Appellants claim that Appellee conceded that "it has and can resort to its eminent domain power under Pennsylvania law in order to condemn the remaining property rights in the Meeker Buffer Zone necessary to protect its gas storage operations." Brief for Appellants at 7. Appellee, for its part, explains that its counsel had recited that, "*prior to* FERC assuming jurisdiction of the storage operations at the Meeker Storage Field . . ., UGI Storage's predecessor, CPG, was indeed clothed with the power of eminent domain pursuant to Pennsylvania law with respect to the storage field." Response of UGI Storage Co. to Plaintiff's Supplemental Memorandum of Law and Further Opposition to UGI Storage Co.'s Preliminary Objections in *Albrecht*, No. 854-CV-2015, at 9 (emphasis in original). We find that Appellee has the better of these arguments.

make further applications with the Commission to expand the certificated Meeker buffer zone.

*Id.* (emphasis added).

To date, Appellee has not acquired any rights to Appellants' properties within the proposed buffer zone. The company, however, has acknowledged the taking of oil and gas rights relative to a single property "in the matter of *Fayviard v. UGI Storage Company*, Tioga County Court of Common Pleas Case No. 699-cv-2013."[8] No information about implementation of a "land acquisitions program" relative to properties within the proposed buffer zone has been provided on the present record.

Thus, from all appearances, the buffer zone surrounding the Meeker storage field remains in a partial, non-intact form, as it did when the proposed buffer zone was deconstructed upon FERC's partial certification. *Accord* Response of UGI Storage Co. to Albrecht's Proposed Findings of Fact and Conclusions of Law in *Albrecht*, No. 854-CV-2015, at ¶7 ("The *fact* is that UGI Storage does not have a 'formal' fully certificated buffer zone around the Meeker Storage Field." (emphasis in original)). And nothing of record suggests that the Commission has ever conducted the sort of site-specific inquiry considering "geology, structure, operational history, presence of third party producers, and any other circumstances or technical information," *Dominion Transmission*, 141 FERC at 61925, 2012 WL 991314, at *7, justifying the maintenance of a non-integral

---

[8] Defendant's Objections and Answers to Plaintiffs' First Set of Interrogatories in *Albrecht*, No. 854-CV-2015, Interrogatory No. 16. It appears that the *Fayviard* stipulation was conditioned on the basis that it could not be used as evidence in any other case. *See* Response of UGI Storage Co. to Plaintiff's Supplemental Memorandum of Law and Further Opposition to UGI Storage Co.'s Preliminary Objections in *Albrecht*, No. 854-CV-2015, at 15.

buffer zone excluding "large acreage positions." *Letter of Post & Schell, P.C.*, dated Nov. 22, 2010, in *UGI Storage*, No. CP10-23-000, at Attachment A.[9]

In November 2015, Appellants filed petitions seeking appointment of a board of viewers to assess damages for an alleged *de facto* condemnation of their property.[10] They invoked Section 502(c) of the Eminent Domain Code,[11] which establishes the procedural avenue for securing just compensation in inverse condemnation scenarios, or upon a *de facto* taking. *See* 26 Pa.C.S. §502(c).

Appellants alleged that Appellee applied for approval of a buffer zone, because the company "wanted to ensure that there would be no [oil and gas extraction] activities in close proximity to the Meeker Storage Field." Amended Petition for Appointment of a Board of Viewers in *Hughes*, No. 0714-CV-2014, at ¶59 (C.P. Tioga). The landowners claimed that, although the company's effort to obtain certification of the entire proposed buffer zone failed, it nonetheless utilizes properties within the uncertificated segments in

---

[9] One could reasonably infer that FERC initially awarded a certificate for the Meeker storage field and a non-integral buffer zone, because the storage field already was in operation, and the Commission had required additional input from Appellee. The reasons why FERC has permitted the buffer zone to remain in a non-integral state throughout the ensuing years are beyond the scope of the present record. To the extent that Appellee has suggested that the Commission has vetted the "need for and the creation of" issues in accordance with the ordinary considerations for such review as set forth in the *Dominion Transport* matter, *see supra* note 6 and accompanying text, nothing in the record before us supports this suggestion.

[10] The Hughes and the Albrecht appellants are represented by a single law firm, and their submissions to the courts have been very similar. The Albrecht petition contained class action allegations that are of no moment here.

[11] The current Eminent Domain Code constitutes a replacement and codification of the former Eminent Code of 1964. *See* Act of May 4, 2006, P.L. 112, No. 34, §1 (as amended, 26 Pa.C.S. §§101–1106) (repealing and replacing the Act of June 22, 1964, Special Sess., P.L. 84 (as amended 26 P.S. §§1–101–1–903)).

the same manner as those within the certified areas, *i.e.*, as an integral 2,980-acre buffer zone. *Id.* at ¶¶4, 64.

Consistent with FERC's explanation in the *Dominion Transmission* matter, Appellants averred that:

> A storage field buffer is necessary to protect the security and integrity of a gas storage reservoir . . .. When exploration or production companies [operate] in proximity of a gas storage field, [this] can cause stored gas to migrate from the storage field to the drilled well thus taking natural gas belonging to the owners of the gas in the storage field.

*Id.* at ¶49; *accord id.* at ¶13 ("The Meeker Buffer Zone is absolutely necessary to protect the integrity of UGI [Storage's] underground storage facilities."). The petition stressed that the concern with drilling within a buffer zone has been heightened after the advent of hydraulic fracturing, a technique through which loosely-controlled fissuring of underground rock frees trapped natural gas for collection. *See, e.g.*, *id.* at ¶3. *See generally Briggs v. SW Energy Production Co.*, ___ Pa. ___, ___, 224 A.3d 334, 337-38 (2020) (discussing the gas-extraction method of hydraulic fracturing).

By virtue of Appellee's application for certification of the proposed buffer zone, Appellants claimed that the company had effectively prohibited all hydraulic fracturing activities on properties within the proposed buffer zone. *See, e.g.*, Amended Petition for Appointment of a Board of Viewers in *Hughes*, No. 0714-CV-2014, at ¶8. And, according to Appellees, the only feasible way to retrieve gas deposits located on their properties within the buffer zone is to utilize this method of extraction. *See id.* The petition specifically averred that "[l]easing entities will not lease oil and gas rights nor will they drill for the exploitation of such rights . . . in the Meeker Buffer Zone." *Id.* at ¶70; *see also id.* at ¶97 (depicting the proposed Meeker buffer zone as a "no-drilling, no-fracking zone

which precluded Plaintiffs from ever being able to obtain oil and gas leases because [l]easing [e]ntities will actively avoid [the zone]").

Appellants recognized that their properties had been excluded by FERC from the certificated buffer zone. Nevertheless, they interpreted Appellee's response to the Commission's order as signaling its intention to apply for additional certifications to obtain property rights relative to the entire proposed buffer zone. *Id.* at ¶10. Centrally, Appellants reiterated their claim that Appellee's actions and statements relative to the proposed buffer zone "were sufficient to prevent oil and gas exploration and production companies from seeking to exploit the land located in the Meeker Buffer Zone for oil and gas." *Id.* at ¶11; *see also id.* at ¶20 ("Fracking is prohibited in areas proximate to storage fields[.]").

In the half-decade since the FERC Order, Appellants complained, Appellee had failed to notify them of any reapplication for certification. Instead, they averred, the company had "pursued a course of conduct that is tantamount to and consistent with the issuance of such a certificate[.]" *Id.* at ¶14. Given their assertion that hydraulic fracturing was actually or effectively prohibited in a buffer zone, the landowners asserted that they had been deprived of their right to obtain financial benefits from the natural gas lying beneath their lands. *See, e.g.*, *id.* at ¶95. For these reasons, they claimed to have suffered a *de facto* condemnation and tendered a demand for just compensation. *See, e.g.*, *id.* at ¶73 ("The [a]pplication for, creating of, and securing of FERC certification of part of the Meeker Buffer Zone constituted a *de facto* taking of Plaintiffs' oil, gas, and mineral rights.").[12]

---

[12] Takings jurisprudence is quite complex, *see, e.g.*, *Penn Central Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123, 98 S. Ct. 2646, 2659 (1978) (depicting the developing review as engagement in "essentially ad hoc, factual inquires"), and this Court has observed that each case must be decided on its unique factual matrix. *See, e.g.*, *McElwee v. SEPTA*,

Based on the amended petitions alone, the common pleas court initially found that a *de facto* taking had occurred and appointed a board of viewers to assess damages. *See, e.g.*, Order dated January 6, 2016, in *Hughes*, No. 714-CV-2014. Appellee lodged preliminary objections asserting, *inter alia*, that Appellants' petition was factually and legally insufficient to support a *de facto* taking claim.

Under Section 504(d) of the Eminent Domain Code, a defendant may file preliminary objections raising factual or legal issues as to whether a *de facto* taking has actually occurred. *See* 26 Pa.C.S. §504(d). Ordinarily, the court then resolves these issues – after an evidentiary hearing, if there are disputed questions of material fact – prior to the appointment of a board of viewers to determine damages. *See generally PBS Coals, Inc. v. PennDOT*, ___ Pa. ___, ___, 244 A.3d 386, 390-91 (2021).

In its preliminary objections, Appellee's lead argument was that, to be liable for a *de facto* taking, an entity must possess the power of eminent domain relative to the

_____

596 Pa. 654, 681, 948 A.2d 762, 779 (2008). The present cases possess highly unique attributes, in that they resemble regulatory takings matters (given that there has been no physical invasion of Appellants' properties, and the landowners' claims derive from Appellee's application for federal regulation). *See generally Penn Central Transp.*, 438 U.S. at 123-28, 98 S. Ct. at 2658-61 (discussing regulatory-takings jurisprudence). But the present cases are idiosyncratic in this respect, both because the regulator isn't the defendant, and the properties in issue are not subject to actual regulation (since they were excluded from the certificated buffer zone).

On the other hand, in the eyes of the federal regulator at least, Appellee violated federal regulatory law by failing to provide Appellants with required notice of its request to include them within a proposed buffer zone; to the degree that the landowners actually are experiencing the effects of a buffer zone, FERC has opined that the company should acquire "necessary property rights," *In re UGI Storage*, 133 FERC at 61397, 2010 WL 4144237, at *13; and Appellants allege that the company's unlawfully presented application for certification of the proposed buffer zone has deprived them of a substantial use of their properties.

We will refrain from further comment about the merits, since the issue before us is limited to a threshold, legal one.

plaintiffs' property. *See, e.g.*, Preliminary Objections in *Hughes*, No. 714-CV-2014, at ¶¶23-24. Appellee recognized that Section 7(h) of the federal Natural Gas Act can confer such authority upon the holder of a certificate of public convenience. *See id.* at ¶23 (citing 15 U.S.C. §717f(h)). The company stressed, however, that it had never been granted such a certificate in relation to Appellants' properties. According to the preliminary objections:

> UGI Storage was granted eminent domain or condemnation authority by FERC in 2010 solely with respect to property in the Meeker Buffer Zone where it, or its predecessors, held a pre-existing interest in the oil, gas and miner[al] rights. Plaintiffs' core assertion here is that it holds the oil, gas and mineral rights on their property[, as to which no such authority was conferred]. Accordingly, the FERC Order, conveyed no power to UGI Storage to condemn the plaintiffs property.

*Id.* at ¶24.

Appellee also asserted that the landowners' allegations were speculative and conjectural. *See id.* at ¶¶27-32. In this line of argument, the company highlighted that FERC didn't prohibit any development activity on non-certificated properties in the proposed buffer zone. *See id.* at ¶32.[13]

In view of Appellee's preliminary objections, the county court stayed its orders appointing boards of viewers, pending resolution of these objections. *See, e.g.*, Order dated February 26, 2016, in *Hughes*, 714-CV-2014.

In the meantime, Appellants sought discovery, including a request for detailed information about the process by which the proposed buffer zone was delineated or demarcated, and they asked Appellee to identify all persons who played a role in such demarcation (presumably to facilitate depositions). *See, e.g.*, Memorandum of Law in

---

[13] Appellee also advanced a standing objection that is not directly relevant at this time.

Support of Motion to Compel Discovery and for Sanctions in *Albrecht*, No. 854-CV-2015, at 13. In its initial responses, at least, the company replied as follows:

> UGI Storage determined that it would propose to FERC a 3,000 foot buffer around the active storage area of the Meeker storage field and used mapping software to plot and determine the acreage within the buffer zone.

Defendant's Objections and Answers to Plaintiffs' First Set of Interrogatories in *Albrecht*, No. 854-CV-2015, at Interrogatory No. 7.

Appellants pressed forward with attempts to secure more detailed information in this respect and many others, and Appellee adhered to its position that additional discovery was unwarranted and the petitions should be dismissed.

The common pleas court scheduled a "hearing/argument/conference" on Appellee's preliminary objections. *See* Scheduling Order dated Jan. 19, 2016, in *Hughes*, No. 854-CV-2015. The ensuing proceeding, conducted on February 24, 2016, was unrecorded. Appellants have contended that the court verbally directed them to submit additional materials on the question of whether there had been a *de facto* taking, along with supplemental briefing. *See* Brief for Appellants in *Hughes v. UGI Storage Co.*, 629 C.D. 2016, at 15a (Pa. Cmwlth.). Appellee, on the other hand, has taken the position that the unrecorded proceeding represented the sole and final opportunity for an evidentiary hearing on the question of whether there had been a *de facto* taking, and that – although Appellants bore the burden of proof – they proceeded, off the record, to waive the opportunity to present any evidence. *See* Brief for Appellee in *Hughes*, 629 C.D. 2016, at 7, 38-39.

Consistent with their view of what had transpired in the unrecorded proceeding, Appellants submitted a brief, together with affidavits in support of their factual averments. They argued that Appellee's preliminary objections should be denied, or alternatively, the

court should conduct an evidentiary hearing to resolve any disputed factual matters. *See, e.g.*, Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendant UGI Storage Co.'s Preliminary Objections, No. 0714-CV-2014, at 16.

The common pleas court granted Appellee's preliminary objections and dismissed the landowners' petitions. In doing so, the county court relied upon a three-part test for whether a *de facto* taking has occurred derived from Commonwealth Court jurisprudence. Under this line of decisions: (1) the condemnor must possess a power of eminent domain; (2) the property owner must have been substantially deprived of the use and enjoyment of his property through exceptional circumstances; and (3) the damages sustained must be "immediate, necessary and unavoidable consequence of the condemnor's exercise of its eminent domain power." *See Hughes v. UGI Storage Co.*, No. 714 CV 2014, *slip op.* at 2 (C.P. Tioga Apr. 6, 2016) (citing *Genter v. Blair Cty. Convention & Sports Facilities Auth.*, 805 A.2d 51, 55-56 (Pa. Cmwlth. 2002) ("[A] *de facto* taking occurs when an entity *clothed with the power of eminent domain* has substantially deprived a property owner of the beneficial use and enjoyment of his property." (emphasis added))).

According to the common pleas court, Appellants' claims failed the first prong, because Appellee lacked the power of eminent domain for relevant purposes. This was so, the court reasoned, because the certificate of public convenience issued by FERC had excluded the landowners' properties from the proposed buffer zone, and federal law imbues Appellee with the power of eminent domain only for lands within the scope of the certification. In the court's view, however, a property-specific power was required to support an inverse condemnation action. *See id.* (citing 15 U.S.C. §717f(h) and *Columbia Gas Transmission Corp. v. An Exclusive Gas Storage Easement*, 776 F.2d 125 (6th Cir. 1985)).

Apparently in the alternative, the county court appeared to credit Appellee's position that the February 24 proceeding represented a full, fair, and final opportunity for Appellants to present evidence in support of their petition. *See id.* at 7-8 ("No evidence to support the assertion [that oil and gas production companies would not enter into leases on properties within the proposed buffer zone] was presented at the hearing on February 24. Thus, even if UGI [Storage] did have the power to condemn, there is nothing in this record to substantiate Plaintiffs' claim that a *de facto* taking has occurred."). According to the court, the record wasn't held open for the submission of additional evidence, and in any event, the affidavits presented by Appellants were inadmissible hearsay. *See id.* at 8 n.1.

Appellants' initial appeals resulted in a remand by a divided intermediate court. *See Hughes v. UGI Storage Co.*, Nos. 629-630 C.D. 2017, *slip op.*, 2017 WL 962449 (Pa. Cmwlth. Mar. 13, 2017) (*en banc*). The majority focused on Appellants' argument that Appellee possessed the power of eminent domain under Pennsylvania law. *See id.* at *2-3. It found that two recent appellate-court decisions might be relevant to that question, and thus, considered it appropriate to remand to consider these cases and to conduct an evidentiary hearing. *See id.* at *3.[14]

Judge McCullough dissented. She opined that Appellee had obtained federal certification to utilize a substantial portion of the proposed buffer zone to protect its natural gas interests. The company had also applied for similar protection relative to Appellants' properties, she continued, but this effort failed "on the relatively technical ground that UGI [Storage] failed to properly notify the class-action plaintiffs and inform them of their right

---

[14] The specifics of the majority's analysis at this stage of the proceedings are not material to our analysis below, since our focus is on the breadth of the power of eminent domain delegated to Appellee under *federal* law. To the degree that Appellee may have the ability to attain such a power under Pennsylvania law, that power is more remote, given that Appellee is not a certificated Pennsylvania public utility.

to protest the proposed taking." *Id.* at *5 (McCullough, J., dissenting). For these reasons, Judge McCullough found it reasonable that a fact-finder might infer or believe that Appellee would attempt to condemn the landowners' properties in the future in order to safeguard its business assets. *See id.* ("[T]he end result is that the brunt of the harm has been inflicted, and the wound remains and will continue to remain."); *see also id.* (positing that Appellants "are isolated on an island in a 'buffer zone' in which oil and gas drilling cannot occur"). Along these lines, she found that the landowners' allegations, when accepted as true, were sufficient to require the appointment of a board of viewers, and therefore, Judge McCullough would have remanded for an evidentiary hearing on the disputed issues of fact. *See id.*

On remand, the common pleas court conducted a conference. Initially, the court attempted to clarify the nature of underground gas storage facilities and associated buffer zones. One of Appellee's lawyers first represented that such a zone exists to address leaks in storage fields. *See N.T.*, Jan. 19, 2019, in *Hughes*, 714-CV-2014, at 2. The court further inquired whether hydraulic fracturing in the vicinity might jeopardize the integrity of the storage field. The attorney replied:

> That is conceivable, Your Honor. And this is where I get into my I'm not an engineer type person, I know fracking has come a long way since they first started fracking; the technology has advanced. And how close you can come to the storage, the actual storage area, I couldn't tell you.

*Id.* at 3. Somewhat inconsistently, another lawyer for the company related:

> I can tell you from the *Fayviard* case, the testimony was that you could frack in the – this is [UGI Storage]'s testimony, that you could frack in the buffer zone. You certainly can't frack in the storage area, but there is nothing that precluded fracking in the buffer zone.

*Id.*

Appellants' counsel espoused the contrary view, and the conversation turned to the threshold legal issue of whether Appellee had the power of eminent domain for relevant purposes. Both sides agreed that the recent cases referenced by the Commonwealth Court majority had no bearing on their own respective positions and that an evidentiary hearing, as contemplated by the intermediate court, was unnecessary to the resolution of the legal question of whether Appellee was invested with a sufficient power of eminent domain. *See id.* at 7, 22-24.[15]

Soon thereafter, Appellants served a notice of deposition of a designee/agent of UGI Storage, pursuant to Rule of Civil Procedure 4007.1(e), seeking to question a corporate witness concerning, *inter alia*:

> (1) Underground gas storage and the geological integrity of gas storage operations.
>
> (2) The geology of underground gas storage operations, including with respect to the storage stratum, the Oriskany Sandstone, caprock, the Marcellus Shale, and the Utica Shale.
>
> (3) The geology of gas storage field buffer zones and the process(es) and purpose(s) for obtaining a buffer zone.
>
> (4) The impact that fracking in a buffer zone can have on underground storage operations, including, without limitation, within the Meeker Storage Field and the Meeker Buffer Zone.

---

[15] Appellee's attorney did indicate that the cases identified by the Commonwealth Court were "very much on point," to the extent they discounted Appellants' arguments under state law. *See id.* at 8. Counsel, however, ultimately returned to the broader argument about Pennsylvania law that Appellee has maintained throughout the litigation, *i.e.*, that state law is irrelevant given that the company did not hold a state-level certificate of public convenience. *See id.* at 22 (reflecting the lawyer's explanation that "[t]he only reason we're talking about the [PUC] is that Plaintiffs have brought up the [PUC] . . ., we don't have a Certificate of Convenience from the [PUC]").

&ast; &ast; &ast;

> (7) The need for and creation of a buffer zone surrounding the Meeker Storage Field.

Notice of Designee/Agent Deposition of Defendant UGI Storage Co. in *Albrecht*, No. 854-CV-2015, at 3. Appellee responded with a motion for a protective order to preclude the deposition, *inter alia*, as an impermissible "transparent fishing expedition." Motion for Protective Order in *Albrecht v. UGI Storage Co.*, No. 854-CV-2015, at 4.

Without resolving the pervasive discovery disputes, the common pleas court reaffirmed its position that an entity must have a property-specific power of eminent domain before it can be liable to pay just compensation under the Eminent Domain Code. Accordingly, the court again sustained Appellee's preliminary objections and dismissed the petitions. *See* Opinion and Order in *Hughes, et al.*, Nos. 714-CV-2014 & 854-CV-2015 (C.P. Tioga Mar. 25, 2019).

On further appeal, the Commonwealth Court affirmed in another divided opinion. *See Hughes v. UGI Storage Co.*, 243 A.3d 278 (Pa. Cmwlth. 2020) (*en banc*). At the outset, consistent with the common pleas court's approach, the majority invoked the intermediate court's prevailing three-part test for *de facto* condemnation requiring (in condensed form) a power of eminent domain in the condemnor, substantial deprivation of beneficial use and enjoyment, and a very close nexus between the deprivation and the exercise of the power of eminent domain. *See id.* at 284 (citing *In re Condemnation by PennDOT, of Right-of-Way for State Route 0079*, 805 A.2d 59, 68 (Pa. Cmwlth. 2002)). Unlike the common pleas court, however, the majority regarded the first prong of this test as encompassing an inchoate power of eminent domain, rather than as requiring a property-specific one. *See, e.g., id.* at 288 (distinguishing between the *power* of eminent domain and the *ability to exercise* such power). Nevertheless, the majority circled back to a property-specific approach under the third prong of the test. According to the

majority, because Appellee was precluded from exercising eminent domain powers over Appellants' properties in the absence of federal certification, the landowners couldn't establish that any asserted deprivation of the use of their property was "the immediate, necessary and unavoidable consequence of the *exercise of the power* to condemn[.]" *Id.* at 289 (quoting *State Route 0079*, 805 A.2d at 68) (emphasis in original).

The majority concluded with a comment that the landowners might not be without a remedy, as they could perhaps pursue causes of action in tort. *See id.* (citations omitted).

President Judge Leavitt and Judge McCullough authored separate responsive opinions differing with the majority's holding. Both authors credited Appellants' core position that the analysis advanced by Appellee and accepted by the majority conflated the elements of a *de jure* condemnation – *i.e.*, a condemnation that has been lawfully initiated by the condemnor in compliance with all statutory requirements – with those of a *de facto* condemnation, which generally reflects a condemnor's unlawful interference with property rights. *See Hughes*, 243 A.3d at 291-92 (Leavitt, P.J., concurring and dissenting) ("[T]he condemnor's failure to follow the statutory procedure for effecting a lawful condemnation is the *sine qua non* of a *de facto* condemnation. It is condemnation that 'occurs outside the legal process.'" (citation omitted)).[16] Because Appellee – as a quasi-public entity invested with the power of eminent domain – was alleged to have substantially diminished the value of Appellants' property, President Judge Leavitt and Judge McCullough would have remanded for an evidentiary hearing concerning whether

---

[16] *See also id.* at 296 (McCullough, J., dissenting) ("Contrary to the way the Majority frames the issue, this is not a case of a *de jure* condemnation, and, thus, it was not necessary for Appellants to prove that UGI [Storage] has specified their property for condemnation in a FERC certificate." (citation omitted)).

a taking had occurred. *See id.* at 294 (Leavitt, P.J., concurring and dissenting); *id.* at 298 (McCullough, J., dissenting).

In the present briefing, Appellants argue that permitting the Commonwealth Court's decision to stand would "eviscerate the law of *de facto* takings" and adversely impact property owners' rights in dozens of buffer zones throughout Pennsylvania. Brief for Appellants at 21. According to the landowners, the majority decision "provides a playbook for how public utilities like UGI [Storage] can enjoy the full benefits and protections of a buffer zone without providing any compensation to affected landowners." *Id.* Appellants find it to be perverse that it has been left entirely to Appellee to decide whether and to what extent to pursue further federal regulatory approval, and a concomitant acquisition of land rights, with respect to properties situated within the proposed buffer zone. *See, e.g., id.* at 44 (contending that the intermediate court's decision "is fundamentally unfair because it empowers the utility itself to be the sole gatekeeper for any buffer zone . . . delineated and used by the utility"). They express the concern that, in such circumstances, Appellee and other gas companies will act solely in their own self-interest and to the detriment of others' rights and interests. *See id.* For these reasons, Appellants urge that they should be permitted to make their case that there was a *de facto* taking in the county court. *See id.* at 36 n.7.

Appellee, for its part, credits the Commonwealth Court with correctly adopting a requirement that, to effect a *de facto* taking, a quasi-public entity – or, in the company's parlance pertaining to the case at hand, "a FERC-regulated interstate natural gas pipeline company" – must possess a property-specific power of eminent domain. Brief for Appellee at 16. In this regard, Appellee advocates adherence to the three-part test

reflected in the Commonwealth Court's jurisprudence. *See id.* at 20.[17] The company dismisses Appellants' policy arguments as overblown and highlights the intermediate court's reference to other potential avenues for relief, which may perhaps be available to the landowners. *See id.* at 32-33. According to Appellee, the United States Supreme Court's recent decision in *PennEast Pipeline Co. v. New Jersey*, ___ U.S. ___, 141 S. Ct. 2244 (2021), is illuminating, in that the Court remarked that, "an eminent domain power that is incapable of being exercised amounts to no eminent domain power at all." *Id.* at 33 (quoting *PennEast Pipeline*, ___ U.S. at ___, 141 S. Ct. at 2260-61).

Under the United States and Pennsylvania Constitutions, private property may not be taken for public use without payment of just compensation to the owners. *See* U.S. CONST. amend. V; PA. CONST., art. I §10. As noted, at least in certain circumstances, the power to condemn and the concomitant constitutional requirement to pay just compensation extend to entities to whom governmental power is delegated, in furtherance of the public interest. *See supra* note 1.

The General Assembly has prescribed that the Eminent Domain Code is intended to provide "a complete and exclusive procedure and law to govern all condemnations of property for public purposes and the assessment of damages." 26 Pa.C.S. §102. Since the Legislature cannot generally abridge the constitutional rights of citizens – such as their right to just compensation when their property is taken for a public purpose – we construe statutes in a manner which is most consistent with the constitutional norms.

---

[17] Appellee disagrees with the Commonwealth Court's conclusion that the first prong of the three-part test is satisfied here, but the company wholly supports the holding that the third prong isn't met. *See id.* at 15 n.8.

*See* 1 Pa.C.S. §1922(3) (specifying that reviewing courts may presume that the General Assembly does not intend to violate the constitution).[18]

Per the relevant definition reposed in the Code, to "condemn" is to "take, injure or destroy property by authority of law for a public purpose." 26 Pa.C.S. §103. This approach adheres closely to the constitutional conception of a taking. *See, e.g.*, *Taking*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining the word "taking," in its constitutional sense, as occurring "when government action directly interferes with or substantially disturbs the owner's use and enjoyment of the property").

The statutory definition of "condemnor" however, interjects the concept of an "acquiring agency," which is defined as "[a]ny entity, including the Commonwealth, *vested with the power of eminent domain* by the laws of this Commonwealth." 26 P.S. §103 (emphasis added). Presumably, the Legislature interposed this vesting criterion on account of a historical line of decisions by Pennsylvania courts depicting takings in this manner. *See, e.g.*, *Stephens v. Cambria & I.R. Co.*, 242 Pa. 606, 610, 89 A. 672, 673 (1914).[19]

But, whatever the derivation, the current statutory reference to a power of eminent domain is expressed in the abstract and solely depicts an attribute of the condemnor within the four corners of the definition of "acquiring agency." In this discrete context, there is no suggestion of any requirement of a relationship or nexus between this power and specific property. Concomitantly, when the General Assembly described the actionable conduct impacting a citizen's property necessary to support an inverse

---

[18] Of course, to the degree that the plain meaning of the enactment deviates from federal or state constitutional law, it may be susceptible to challenge relating to its procedural or substantive effect, as well as in its prescription for exclusivity. No such challenge is presented here, however, and our consideration is limited accordingly.

[19] As discussed below, this line of decisions seems to be in tension with federal takings jurisprudence, as it has evolved over the ensuing years.

condemnation claim in Section 502(c)(2) – *i.e.,* "condemnation" or the taking, injuring or destroying such property by authority of law for a public purpose, *see* 26 P.S. §103 (definition of "condemn") – it said nothing about a power of eminent domain. Rather, to effect an actionable taking, it is enough that the condemnor has proceeded by authority of law for a public purpose. *See id.*; *see also id.* §502(c)(1) (providing for an inverse condemnation action when a condemnation – *i.e.,* taking, injuring, destruction of property by authority of law for a public purpose – has occurred without the filing of a declaration of taking).[20]

The plain terms of the enactment, therefore, support Appellants' position, or in other words, the statute simply does not signify a requirement of a property-specific power of eminent domain.

This understanding is also most consonant with federal and state constitutional law. For example, the Fifth Amendment to the United States Constitution does not limit the prohibition against the exercise of governmental power to take private property for public use without just compensation to instrumentalities of government possessing the power of eminent domain. *See* U.S. CONST. amend. V. Facially, it is illegal to do so whether or not an agency may have had a right to condemn by proper means and with appropriate payment.

---

[20] Notably, in addition to making no mention of a property-specific power of eminent domain, the main, operative provisions of Section 502(c) – Sections 502(c)(1) and (2) – do not even contain the term "condemnor." Thus, one could perhaps argue that the Legislature didn't intend to interject that particular conception (and hence, the power-of-eminent-domain attribute) into the arena of *de facto* condemnations at all. It this were true, of course, the General Assembly would have proceeded to signify its intention in a most oblique fashion. In any event, the term "condemnor" does appear in a technical provision appended to Section 502(c), *see* 26 Pa.C.S. §502(c)(4) (requiring "the condemnor" to file a copy of a particular order associated with a *de facto* condemnation with the recorder of deeds), thus signifying that the presence of a statutorily-defined condemnor is implicit in the operative provisions of that section.

Notably, there are various lines of decisions by the Supreme Court of the United States concerning regulatory takings and exactions, in which government regulations or requirements have been found to be so onerous as to deprive property owners of the beneficial use and enjoyment of their property. *See, e.g.*, *Nollan v. California Coastal Commission*, 483 U.S. 825, 841-42, 107 S. Ct. 3141, 3151 (1987) (holding that a state agency's requirement for landowners to provide uncompensated easements as a condition to land-use approval constituted a taking). In these decisions, the Supreme Court hasn't parsed through whether or not each offending agency has a power of eminent domain. *See, e.g., id.*

Several courts have made the point more directly, for example, as follows:

> [W]e disagree with the basic premise . . . that an inverse condemnation action will not lie against [a government agency] because it does not have the power of eminent domain. A taking occurs when a public entity substantially deprives a private party of the beneficial use of his property for a public purpose. . . . Definitionally, the concept of an unconstitutional taking does not turn on which public agency deprived a private party of the use of his property, but rather, turns on the fact of the deprivation for public use. If official authorities act on behalf of the state so as to take private property for public use without just compensation, even if they are acting outside of the scope of their official powers, they have violated the fifth and fourteenth amendments and are subject to an inverse condemnation suit. As long as the state acts through one of its arms in such a way as to deprive an individual of his property for public use, it is irrelevant whether the state arm doing the actual taking has the power of eminent domain.

*Fountain v. Metropolitan Atlanta Rapid Transit Auth.*, 678 F.2d 1038, 1043-44 (11th Cir. 1982) (citations omitted).[21]

---

[21] *Accord Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 911 F.2d 1331, 1341 (9th Cir. 1990) ("Governments cannot avoid the strictures of the

Although these cases concern government agencies as such, as we have observed, where governmental power is delegated to an otherwise private corporation, that company may assume a quasi-public status in furtherance of the public interest. *See supra* note 1. And while the issue hasn't been put before us in these terms, and therefore our treatment of it is not binding, we do not presently discern a constitutional requirement that a quasi-public entity alleged to have invoked governmental power to deprive landowners of the use and enjoyment of their property for a public purpose must be invested with a power of eminent domain in order to be held to account for a *de facto* condemnation.

The Eminent Domain Code says so, of course, of both public and quasi-public entities, *see* 26 Pa.C.S. §103 (definitions of "condemn" and "acquiring agency"), and this case does not call for us to resolve any incongruities between the Legislature's prescription that the statute provides an exclusive procedure to secure a remedy and federal constitutional takings jurisprudence. Rather, for present purposes, we merely adopt a plain-meaning interpretation of the Eminent Domain Code – which, as between the competing positions before us, is the one most consonant with constitutional norms – and we hold that a public or quasi-public entity need not possess a *property-specific* power of eminent domain in order to implicate inverse condemnation principles.[22]

---

Constitution through the expedient of delegating regulatory powers, but not the power of eminent domain, to independent government entities that would then be free to zone away all use of private property without fear of liability."); *Dep't of Forests, Parks & Recreation v. Town of Ludlow Zoning*, 869 A.2d 603, 609 (Vt. 2004); *Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 705 P.2d 866, 868 (Cal. 1985) ("A landowner whose property has been invaded by a public entity that lacks eminent domain power suffers no less a taking merely because the defendant was not authorized to take.").

[22] We also agree with Appellants that the statement of the United States Supreme Court in *PennEast Pipeline* that "[a]n eminent domain power that is incapable of being exercised amounts to no eminent domain power at all," *PennEast Pipeline*, ___ U.S. at ___, 141 S.

At this juncture, it appears that the case should be returned to the Commonwealth Court to address Appellants' challenge to the common pleas court's alternative disposition (based upon the landowners' purported off-the-record waiver of any entitlement to an evidentiary hearing), which had been obviated by the intermediate court's initial remand decision and that court's ensuing affirmance of the re-dismissal of Appellants' petitions.

The order of the Commonwealth Court is vacated, and the matter is remanded for further proceedings consistent with this opinion.

Chief Justice Baer and Justices Todd, Donohue, Dougherty and Wecht join the opinion.

Justice Mundy did not participate in the consideration or decision of this matter.

---

Ct. at 2260-61, had little bearing here. That assertion was made in the context of deciding whether or not a state may assert Eleventh Amendment immunity to resist the taking of state property by a quasi-public entity invoking a *de jure* power of eminent domain delegated by the federal government. *See id.* at ___, 141 S. Ct. at 2251. We do not read the decision as in any way specifying that a public or quasi-public entity must have a power of eminent domain – let alone a property-specific power – in order to be held liable to pay just compensation in a *de facto* condemnation scenario.