IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brian Albert and Donna Albert     :
     :   CONSOLIDATED CASES
        v.     :
     :
City of Pittsburgh and the     :
Pittsburgh Water and Sewer     :
Authority     :   Nos. 1437 C.D. 2023
     :       1438 C.D. 2023
Appeal of: City of Pittsburgh     :   Argued: September 9, 2024

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON            FILED: October 4, 2024

The City of Pittsburgh (City)[1] appeals from an order of the Court of Common Pleas of Allegheny County (trial court) dated October 31, 2023, in which the trial court overruled the City's preliminary objections to a petition filed by Brian and Donna Albert (Alberts) seeking the appointment of viewers to assess damages for a *de facto* taking of their property. Upon review, we affirm the trial court's order.

## I. Background

In 2018, the Alberts purchased a residential property fronting on Andover Terrace in the Oakland section of the City. Reproduced Record (R.R.) at

---

[1] Although originally named as a codefendant, the Pittsburgh Water and Sewer Authority is no longer part of this action. Reproduced Record (R.R.) at 124a.

212a. They rented out the property but intended eventually to reside there. *Id.* at 212a-13a.

Andover Terrace traverses a steeply sloping area and is partly supported by a poured concrete retaining wall. *See* R.R. at 128a-31a & 134a. In early March 2022, the Alberts contacted the City with concerns that the street was pulling away from the sidewalk in front of their property. *Id.* at 158a. During the ensuing weeks, the City determined that a landslide was occurring that was causing the retaining wall to fail and the street and sidewalk to sink and collapse, allowing soil to move downhill and compromising support for the Alberts' property and others above and below Andover Terrace. *Id.* at 172a-74a.

In March and April 2022, the City closed the street and the sidewalk, respectively, in the area around the Alberts' property.[2] R.R. at 138a, 152a & 219a. Thereafter, the City attempted, unsuccessfully, to slow the progress of the landslide by removing the pavement and underlying brick pavers.[3] *Id.* at 139a & 171a-72a. The City later installed soil nails[4] under the Alberts' property in an attempt to

---

[2] As discussed below, this case does not concern the underlying cause of the landslide or whether the City committed any intentional act that contributed to causing it. Rather, the trial court's *de facto* taking analysis focused on the City's intentional conduct in blocking access and then delaying restoration of the street and sidewalk and restoring the compromised surface support for adjacent properties, and specifically the Alberts' property, once the landslide began.

[3] The City theorized that removing the weight of the pavement and brick pavers might reduce downward pressure on the subsoil and slow the progress of the landslide. R.R. at 170a-72a & 194a-95a. However, in order to prevent runoff of the now-exposed soil under the pavement, the City dumped large amounts of gravel to replace the pavement and sidewalk; it also stored heavy equipment on Andover Terrace. *Id.* at 195a.

[4] "Soil nails are reinforcing, passive elements that are drilled and grouted sub-horizontally in the ground to support excavations in soil, or in soft and weathered rock . . . ." U.S. Dep't of Transp. Fed. Highway Admin., *Soil Nail Walls Reference Manual* (7th ed. 2015) at 2, available online at https://highways.dot.gov/sites/fhwa.dot.gov/files/FHWA-NHI-14-007.pdf (last visited September 16, 2024).

stabilize the soil by attaching it to bedrock. *Id.* at 179a-80a. By the time of the trial court's view of the property and Andover Terrace in September 2023, however, the street level had sunk about 20 feet below its former level in front of the Alberts' property. *Id.* at 129a & 136a-37a.

The City needed easements from several property owners to install soil nails and otherwise stabilize the soil in the areas above and below Andover Terrace. R.R. at 133a-34a & 182a. The City preferred obtaining voluntary easements rather than acquiring them by eminent domain. *Id.* at 194a. However, the City demanded that the property owners sign easement agreements waiving all rights and claims against the City that might arise from the City's exercise of its easement rights. *Id.* at 193a-94a & 235a. The City also refused to pay more than $1.00 for an easement. *Id.* at 246a. When, despite months of ongoing demands by the City regarding the easements, the Alberts and the owners of another affected property refused to accede to the City's demands that they waive their rights to any claims or compensation, the City cited the Alberts and the other landowners for City Code violations in an attempt to bully the owners into granting the easements.[5] *Id.* at 202a-06a, 209a & 243a-44a. The Alberts and the other landowners were forced to expend time and money in magisterial proceedings before the citations were finally dismissed. *Id.* at 244a & 265a-66a & 646a-47a. Ultimately, after delaying soil stabilization efforts for many months while unsuccessfully attempting to coerce the easement from the Alberts, the City took an easement by eminent domain in February 2023, paying the

---

[5] Some other landowners who resisted the requested easement did so because it was the City's second easement request to them, and the City had not yet performed site cleanup on their properties that it had promised in the first easement agreements. R.R. at 202a-06a. Instead of living up to its prior agreements, the City then cited those landowners for not having performed the site cleanup the City itself had agreed to do. *Id.* As the trial court cogently observed at the hearing, "You can't treat people like that." *Id.* at 265a.

Alberts $26,000.00 as its initial estimate of fair compensation. *Id.* at 182a-85a & 246a.

The City recognized the situation as an emergency from the time it first became aware of the landslide and examined the site in March 2022. R.R. at 133a, 140a, 150a, & 164a. However, faced with this acknowledged emergency, the City still had no final plan for correcting the situation and restoring access to the Alberts' property as of the time of the hearing before the trial court one and one-half years later in September 2023. *Id.* at 151a, 197a & 248a. Moreover, the City had no firm time estimate for completion of the correction process. *Id.* at 190a, 196a-97a, 234a, 647a; *see also id.* at 73a-74a. The City did not even request funding for the project until it did so for inclusion in the 2024 budget.[6] *Id.* at 110a, 150a-52a & 186a. The City did not anticipate starting the project until at least 2024. *Id.* at 190a-91a.

The Alberts have had no street access since March 2022 and no means of access to their property at all since the closure of the sidewalk in April 2022. R.R. at 128a, 134a, 137a & 152a. All utility services have been shut off because of safety concerns. *Id.* at 140a-41a. The property has also suffered serious structural damage, including cracking in the patio, shifting of the foundation and exterior steps, and major cracking of ceilings, walls, and supports. The extent of the damage is apparent in photographs entered into evidence before the trial court, including photographs showing the separation of exterior walls to the extent that the outdoors are plainly visible from inside the house through the separation. *Id.* at 335a-56a. In addition, effective October 1, 2023, the Alberts' insurer cancelled their homeowners' policy

---

[6] A City witness testified that if the funding request had not been approved in the 2024 budget, the City would have had to look for the needed funds in other parts of its budget. R.R. at 191a-92a. The City offered no evidence or explanation why it did not do so in 2022 or 2023 in order to move forward with correction of what the City acknowledged was an emergency situation.

4

on the property because it was uninhabitable. *Id.* at 250a & 390a. The cancellation created a condition of default under the terms of the mortgage loan for the property, exposing the Alberts to potential acceleration of the debt. *Id.* at 214a, 248a-49a, 366a & 376a.

The Alberts filed a petition for appointment of viewers, asserting that the City's conduct amounted to a *de facto* taking of their property. After a hearing and a view of the property and Andover Terrace, and based on the totality of the circumstances, the trial court overruled the City's preliminary objections to the petition and ordered the appointment of viewers. This appeal by the City followed.

## II. Issues

On appeal,[7] the City raises three issues for review by this Court. First, the City maintains that the Alberts failed to meet the elements of a *de facto* taking and that the City's closure of Andover Terrace was an exercise of its police power, not a *de facto* taking. Second, and relatedly, the City insists the Alberts have not proved a permanent deprivation of their property. Third, the City asserts error by the trial court in expediting the hearing, which ostensibly prevented the City from presenting expert testimony regarding causation of the landslide.

Because the City's first and second issues are interrelated, we address them together.

---

[7] This Court's review of an order disposing of preliminary objections to a petition for appointment of viewers is limited to determining "whether the common pleas court's findings are supported by substantial evidence of record, and whether the court abused its discretion or committed an error of law." *Thomas A. McElwee & Son, Inc. v. Se. Pa. Transp. Auth.*, 948 A.2d 762, 771 (Pa. 2008).

5

## III. Discussion

### A. *De Facto* Taking of the Alberts' Property

The Eminent Domain Code (Code)[8] "provides the exclusive method and practice governing eminent domain proceedings, including *de facto* takings, and . . . preliminary objections are the exclusive method of raising objections to a petition for appointment of viewers alleging a *de facto* taking[.]" *York Rd. Realty Co., L.P. v. Cheltenham Twp.*, 136 A.3d 1047, 1050 (Pa. Cmwlth. 2016) (quoting *Gerg v. Twp. of Fox*, 107 A.3d 849, 852 (Pa. Cmwlth. 2015) (additional quotation marks omitted)). Section 502(c)(1) of the Code authorizes the "owner of a property interest who asserts that the owner's property interest has been condemned without the filing of a declaration of taking [to] file a petition for the appointment of viewers . . . setting forth the factual basis of the petition." 26 Pa.C.S. § 502(c)(1). "[P]reliminary objections in the context of proceedings under the Code are distinct from preliminary objections in the context of a proceeding under the Pennsylvania Rules of Civil Procedure." *York Rd.*, 136 A.3d at 1050 (quoting *William Schenk & Sons v. Northampton, Bucks Cnty., Mun. Auth.*, 97 A.3d 820, 824 (Pa. Cmwlth. 2014) (additional quotation marks omitted)). "In proceedings under the Code, preliminary objections are intended as a procedure to resolve all legal and factual challenges to a declaration of taking before proceeding to the damages issue – *i.e.*, hearing by an appointed board of viewers." *York Rd.*, 136 A.3d at 1050 (quoting *William Shenk*, 97 A.3d at 824) (additional quotation marks omitted)). Thus, an order disposing of preliminary objections to a petition for the appointment of viewers alleging a *de facto* taking is final and appealable. *Dep't of Transp. v. Lawton*, 412 A.2d 214, 215 (Pa. Cmwlth. 1980).

---

[8] 26 Pa.C.S. §§ 101-1106.

6

This Court recently explained a *de facto* taking as follows:

> To prove a *de facto* taking, the property owner must establish "exceptional circumstances that substantially deprived him of the beneficial use and enjoyment of his property." *York* [*Rd.*], 136 A.3d [at] 1050 . . . ) (citing *In re Borough of Blakely*, 25 A.3d 458, 463-64 (Pa. Cmwlth. 2011)). This deprivation "must be caused by the actions of an entity with eminent domain powers," and the damages sustained must be "an immediate, necessary and unavoidable consequence of the exercise o[f] the entity's eminent domain powers." *York* [*Rd.*], 136 A.3d at 1050. A *de facto* taking "is not a physical seizure of property; rather, it is an interference with one of the rights of ownership that substantially deprives the owner of the beneficial use of his property. The beneficial use of the property includes not only its present use, but all potential uses, including its highest and best use." *Id.* at 1050-51.

*N-Jie v. Dep't of Transp.*, 300 A.3d 1131, 1138 (Pa. Cmwlth. 2023).

As a general rule, there is a heavy burden of proof in *de facto* taking cases. *Griffith v. Millcreek Twp.*, 215 A.3d 72, 75 (Pa. Cmwlth. 2019). The owner must allege and prove that 1) the condemnor has the power to condemn the land under eminent domain procedures; 2) exceptional circumstances have substantially deprived the owner of the use and enjoyment of the property; and 3) the damages sustained were the immediate, necessary, and unavoidable consequences of the exercise of eminent domain. *Appeal of Jacobs*, 423 A.2d 442, 443 (Pa. Cmwlth. 1980); *see also Mieze v. City of Pittsburgh* (Pa. Cmwlth., No. 902 C.D. 2021, filed Jan. 30, 2023),[9] slip op. at 4, *appeal denied*, 303 A.3d 113 (Pa. 2023) (citing *Jacobs*). Here, only the third factor is at issue.

---

[9] Unreported opinions of this Court issued after January 15, 2008 may be cited as persuasive authority pursuant to Section 414(a) of this Court's Internal Operating Procedures. 210 Pa. Code § 69.414(a).

"There is no bright line test to determine when government action is deemed to result in a *de facto* taking; instead, each case must be examined and decided. Thus, courts must provide, with case by case development, the needed doctrinal elaboration." *Thomas A. McElwee & Son, Inc. v. Se. Pa. Transp. Auth.*, 948 A.2d 762, 777 (Pa. 2008) (citing *Lehigh-Northampton Airport Auth. v. WBF Assocs.*, 728 A.2d 981, 985-86 (Pa. Cmwlth. 1999)); *see also Blakely*, 25 A.3d at 465 (stating that "there is no bright line test to determine when a government action results in a *de facto* taking; each case turns on its own facts") (citations omitted).

Here, the City maintains that its actions were in exercise of its police power rather than its eminent domain power. This argument is misplaced to the extent that the City asserts it in connection with the structural damages resulting from the loss of surface support for the Alberts' property. Separately from the issue of the duration of the loss of access and other factors relating to a *de facto* taking, Section 714 of the Code expressly provides that "[a]ll condemnors,[10] including the Commonwealth, shall be liable for damages to property abutting the area of an improvement resulting from change of grade of a road or highway, permanent interference with access or injury to surface support, whether or not any property is taken." 26 Pa.C.S. § 714. There is apparently no dispute that the landslide and the City's subsequent removal of and failure to restore Andover Terrace resulted in injury to surface support of the Alberts' property. *See, e.g.*, R.R. at 523a (report of the City's contracted engineering firm indicating "a substantial slope failure"). As set forth above, the evidence presented to the trial court amply demonstrated that the loss of surface support caused severe structural damage to the Alberts' house. *Id.* at

---

[10] Section 103 of the Code defines a condemnor as "[t]he acquiring agency, including the Commonwealth, that takes, injures or destroys property by authority of law for a public purpose." 26 Pa.C.S. § 103.

8

335a-56a. They are expressly entitled by Section 714 to recover for that damage in a proceeding *under the Code*, and *regardless of whether any property is taken*. 26 Pa.C.S. § 714. This provision facially applies whenever there is a loss of surface support. It offers no exception where the loss of surface support results from the exercise of a municipality's police power.

> Further, as this Court explained in *N-Jie*,
>
> [t]here is an important difference between the exercise of police powers and the exercise of eminent domain powers. We have explained that difference as follows:
>
>> Police power should not be confused with that of eminent domain. Police power controls the use of property by the owner, for the public good, its use otherwise being harmful, while eminent domain and taxation take property for public use. Under eminent domain, compensation is given for property taken, injured or destroyed, while under the police power no payment is made for a diminution in use, even though it amounts to an actual taking or destruction of property. . . .
>
> [*In re*] *Condemnation* [*by Dep't of Transp.*] *of Two Billboards* [*Located on T.R. 209*], 452 A.2d [83,] 85 [(Pa. Cmwlth. 1982)] . . . . Nevertheless, "the Commonwealth may not effect what amounts to a taking under the guise of its police power without paying compensation." *Ristvey* [*v. Dep't of Transp.*], 52 A.3d [425,] 432 [(Pa. Cmwlth. 2012)]. "A person's right to private ownership of his property is only subject and subordinate to reasonable regulation by the government for the preservation of public health, safety, and morals." *Id.* . . . [A public agency] may not "unduly intermeddle" with property rights of property owners. *Id.* "If it does, then an exercise of its police powers may, in certain circumstances, constitute a compensable taking."[] *Id.*

*N-Jie*, 300 A.3d at 1138-39 (internal emphasis and footnote omitted).

9

More specifically, and relevant here, "temporary interference with road access falls under the non[-]compensable exercise of the police power necessary to effectuate public improvement, *unless the alleged interference was accomplished in an arbitrary or unreasonable manner, or became unduly prolonged*." *N-Jie*, 300 A.3d at 1139 (citing *McElwee*, 948 A.2d at 778) (emphasis partly original and partly added); *see also Truck Terminal Realty Co. v. Dep't of Transp.*, 403 A.2d 986, 989 (Pa. 1979). "[T]he essential difficulty lies in ascertaining when the infringement upon reasonable access becomes unduly prolonged, or is otherwise accomplished in an arbitrary and unreasonable manner." *McElwee*, 948 A.2d at 778. Thus, "the issue distills to whether the case adduced by [the landlowner] demonstrates interference with access that was unreasonable under all of the circumstances." *Id.* at 779. In this regard, "the duration of any such impairment plays a significant role in determining whether the impairment substantially interferes with the owner's right to access his or her property." *Id.* (quoting *ASAP Storage, Inc. v. City of Sparks*, 173 P.3d 734, 741 (Nev. 2007) (additional quotation marks omitted)).

In *Newman v. Department of Transportation*, 791 A.2d 1287 (Pa. Cmwlth. 2002), this Court affirmed a common pleas court's conclusion that a *de facto* taking occurred where a landowner was denied access to his business property for more than two years during a Pennsylvania Department of Transportation (PennDOT) road construction project, forcing the closure of the business during the construction. *Id.* at 1290.

In *N-Jie*, PennDOT removed a footbridge that was the landowner's only access from the road to his property because the PennDOT-owned pillar supporting the footbridge was deteriorated. PennDOT then blocked the spot with a new guardrail. Although the removal of the pillar may have been an exercise of police

10

power, this Court found that PennDOT's interference with the landowner's access to his property "was unreasonable and prolonged" and left the landowner landlocked by removing his only access to his property; therefore, it constituted a *de facto* taking. *N-Jie*, 300 A.3d at 1140-41.[11]

Here, the City intentionally blocked access to the Alberts' property. R.R. at 138a, 152a & 219a. Then, despite recognizing the emergency nature of the ongoing landslide in March 2022, the City delayed for many months in starting stabilization efforts on adjacent properties, including the Alberts' property, while it tried to bully the landowners into signing easement agreements waiving their legal rights to claims against the City for compensation. *Id.* at 133a-34a, 140a, 150a, 164a, 182a-85a, 193a-94a, 202a-06a, 235a, 246a, 202a-06a, 209a, 243a-44a, 246a, 265a-66a & 646a-47a. Further, the record is bare of any indication that the City promptly sought funding for a remediation project to restore Andover Terrace prior to its request for funding in the 2024 budget. In addition, by the time of the hearing before the trial court in September 2023, one and one-half years after the City was first informed of the emergency arising from the landslide, it still had no plan for correction of the problem. *Id.* at 151a, 197a & 248a.

Under the totality of the circumstances – the City's complete denial of access to the Alberts' property for several years, and with no definite end date in sight, along with serious structural damage to the house, and the City's intentional delays and strongarm tactics – the trial court properly concluded there was a *de facto*

---

[11] *Mieze v. City of Pittsburgh* (Pa. Cmwlth., No. 902 C.D. 2021, filed Jan. 30, 2023), *appeal denied*, 303 A.3d 113 (Pa. 2023), is distinguishable and not persuasive. There, the City's engineer and engineering contractor disagreed about whether stability had been sufficiently achieved so as to allow the landowner to begin repairs necessitated by a landslide, as well as what, if any, additional action by the City was necessary to prevent possible future damage. *Id.*, slip op. at 6-7. Thus, there was no intentional conduct by the City delaying its construction of repairs after the landslide.

taking. *See McMaster v. Twp. of Bensalem*, 161 A.3d 1031, 1037 (Pa. Cmwlth. 2017) (explaining that "[b]oth the nature of the government actions and the type of damage to the property must be considered in determining whether a *de facto* taking has occurred. If the government actions that harmed the property were intentional, that supports the conclusion that the harm is a *de facto* taking . . . ."); *see also DeLuca v. Mountaintop Area Joint Sanitary Auth.*, 166 A.3d 553, 562 (Pa. Cmwlth. 2017) (explaining that lack of intent to effect a taking is irrelevant to whether there has been a *de facto* taking, which requires only that the injury to the landowner's property interest "is a direct result of intentional action by an entity clothed with the power of eminent domain"); *cf. Elser v. Dep't of Transp.*, 651 A.2d 567, 569-70 (Pa. Cmwlth. 1994) (affirming a trial court's finding of a *de facto* taking where PennDOT intentionally dumped gravel for a road project onto the landowners' driveway, blocking their access and forcing them to drive across their lawn to reach their house, one day after the landowners obtained a stop work order because PennDOT's traffic light installation for the project encroached on the landowners' property outside PennDOT's easement; landowners subjected to an intentional blockage of access by an entity clothed with eminent domain power are not restricted to a trespass action and may proceed under the Code). That finding was supported by substantial evidence, and we discern no error of law or abuse of discretion by the trial court.

In addition, conduct that causes a landowner to be faced with potential loss of the property may also constitute a *de facto* taking. *See Gaughen v. Dep't of Transp.*, 554 A.2d 1008, 1013-14 (Pa. Cmwlth. 1989) (first citing and discussing *Lawton*, 412 A.2d at 217 (explaining that when public awareness of planned condemnation caused the landowner to lose income from tenants and led to potential

12

loss of the property, a *de facto* taking had occurred); then citing and discussing *Conroy-Prugh Glass Co. v. Dep't of Transp.*, 321 A.2d 598 (Pa. 1974) (same); and then citing and discussing *Peter Roberts Enters., Inc. v. Dep't of Transp.*, 376 A.2d 1028 (Pa. Cmwlth. 1977) (holding that a *de facto* taking occurred where landowner could not develop its property because of PennDOT's plan for a future road across the property, but the mortgage remained outstanding and the landowner faced loss of the property at a tax sale)).

Although the trial court here did not specifically rely on cases addressing this issue, they offer additional support for its decision. The Alberts lost their tenants and their ability to seek replacement tenants because access to their property was completely blocked by the City's closure of the street and sidewalk. R.R. at 138a, 152a & 219a. The continued lack of access and the ongoing landslide and resulting property damage also resulted in the disconnection of all utility services. *Id.* at 140a-41a. Eventually, the Alberts' homeowners' insurer cancelled the policy on the property because it was uninhabitable. *Id.* at 250a & 390a. This exposed the Alberts to potential acceleration of the mortgage balance by the lender. *Id.* at 214a, 248a-49a, 366a & 376a. These circumstances are sufficiently analogous to those in the cases cited above to offer further persuasive support for the trial court's finding of a *de facto* taking of the Alberts' property.

For all of these reasons, we conclude that the trial court did not err in overruling the City's preliminary objections to the Alberts' petition for appointment of viewers to assess damages for a *de facto* taking.

**B. Expediting the Trial Court Hearing**

On July 10, 2023, the trial court issued an order scheduling a hearing on the City's preliminary objections for October 30, 2023. R.R. at 55a. The City asserts that, in preparation for the hearing, it retained experts to study the landslide and opine on its cause. "The City intended to use the findings of its expert to support the City's claim that there was no affirmative act of the City causing the subsidence of Andover Terrace, and thus no intentional act depriving the Alberts of their property." Br. of City at 27.

However, after the Alberts received notice that their homeowners' insurance on the property was being cancelled, they requested an expedited hearing, and on August 16, 2023, the trial court, over the City's objection and after hearing argument on the objection, entered an order moving the hearing up to September 13, 2023. R.R. at 96a. The City contends that the trial court abused its discretion by moving the hearing date and thereby preventing the City from obtaining its expert report in time for the hearing. Br. of City at 27. We disagree.

In its brief, the City cites no authority or record evidence to support its assertion that it was prevented from obtaining a completed expert report in time for the hearing. *See* Br. of City at 26-27. Although the hearing was moved up by about six weeks, the City still had over two months from the date of the trial court's original scheduling order, and almost one month from the order expediting the hearing, to obtain its expert report. By failing to explain or develop an argument concerning its purported inability to obtain an expert report in that time, the City has waived that argument. *See Whitehall Manor, Inc. v. Planning Comm'n*, 79 A.3d 720, 737 (Pa. Cmwlth. 2013) (first citing *Hoffman v. Borough of Macungie*, 63 A.3d 461 (Pa.

Cmwlth. 2013); and then citing *Commonwealth v. TAP Pharm. Prods., Inc.*, 36 A.3d 1197, 1273 (Pa. Cmwlth. 2011), *vacated*, 94 A.3d 350 (Pa. 2014)).

Moreover, the City could not have been prejudiced by its alleged inability to present expert evidence concerning causation of the landslide, because the cause of the landslide is not relevant to the question of whether the City effected a *de facto* taking in this case. The intentional conduct at issue was not conduct that caused the landslide, but rather, ongoing intentional conduct in blocking access to the Alberts' property and then in delaying remedial action by the City, an entity clothed with eminent domain power, to the point where the Alberts (1) were deprived of all access to their property for an extended period and (2) ultimately incurred serious structural damage to the house from the City's delay in restoring adjacent support to the Alberts' property that the street had provided. That conduct is discussed in detail above, but perhaps the most glaring example is the City's intentional delay of stabilization efforts on the Alberts' property and other private properties for many months while, instead of using its eminent domain power to take the necessary easements, it tried to strongarm the landowners, including the Alberts, into signing easement agreements waiving rights to which they would be entitled in an eminent domain proceeding.

Accordingly, the trial court did not abuse its discretion in expediting the hearing.

## IV. Conclusion

For the foregoing reasons, we affirm the trial court's order.

_____
CHRISTINE FIZZANO CANNON, Judge

Judge McCullough did not participate in the decision in this case.

15

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brian Albert and Donna Albert     :
        :    CONSOLIDATED CASES
v.          :
        :
City of Pittsburgh and the     :
Pittsburgh Water and Sewer    :
Authority          :    Nos. 1437 C.D. 2023
        :          1438 C.D. 2023
Appeal of: City of Pittsburgh    :

# **O R D E R**

AND NOW, this 4th day of October 2024, the order of the Court of Common Pleas of Allegheny County dated October 31, 2023 is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge